CASE 119—ACTION BY CHARLES E. VOKES AGAINST GEORGE ·F. EATON
    AND OTHERS TO RECOVER MONEY PROCURED TO BE INVESTED BY HIM
    BY FALSE AND FRAUDULENT REPRESENTATIONS.—FEB. 23.

# Vokes v. Eaton, &c.

APPEAL FROM  KENTON  CIRCUIT  COURT—WM. McD.  SHAW,  CIRCUIT
    JUDGE.

JUDGMENT FOR DEFENDANT.  PLAINTIFF APPEALS.  AFFIRMED.

CORPORATIONS—AUTHORIZED  PURPOSES—DECEIT—EXPRESSION OF OPIN-
    ION.

1. Annotated Statutes, South Dakota, 1901, section 3812, authoriz-
    ing the formation of corporations for mining, manufacturing,
    mechanical, quarrying, "and other industrial pursuits, and for
    any other lawful business," does not limit the formation of
    corporations to purposes similar to those enumerated.
2. A corporation is not organized for an unlawful business, so as
    to make its officers liable for money invested in its bonds, be-
    cause the coupons thereon are to be paid, as money accumu-
    lated, in the order of their number, though the business is bot-
    tomed on a scheme which, under ordinary conditions, will not
    result in all the coupons being paid.
3. For officers of a corporation, in selling its bonds, the coupons of
    which are payable in the order of their numbers from time to
    time as money accumulated, to state that the scheme will fi-
    nance out, is but an expression of opinion, which will not make
    them liable for false representations.

STRICKLETT & ARNETT, FOR APPELLANT.

CLASSIFICATION UNDER RULE 17 OF THE COURT, OF THE
QUESTIONS DISCUSSED.

1. A corporation can not be formed for the purpose of accomplishing a fraud or other illegal act. Clark & Marshall on Private Corporations, volume 1, pages 22 and 248. McGrew v. City Produce Exchange 85 Tenn., 582.

2. To constitute a valid corporation, there must be a valid law authorizing the organization of a corporation for the purpose for which it was organized, and if a corporation is not organized under such laws, it does not acquire a *de facto* corporate existence, and such corporation may be attacked collaterally by creditors, as well as directly by the State. Clark & Marshall on Private Corporations, vol. 1, pages 129, 241 and 248. Davis, etc., v. Stevens, etc., 104 Fed. Rep., 235; Eaton v. Walker, etc., 76 Mich., 597, 6 L. A. R., 102; Cincinnati Cooperage Co. v. Bate, 14 Ky. Law Rep., 469.

3. Where certain things are enumerated, and followed by general words, but does not specify what other things are intended thereby, such general words relate only to things that are of a kindred nature to the things specified. Clark & Marshall on Private Corporations, vol. 1, page 135; State of Wisconsin v. Interstate Investment Co., 88 Wis., 512; Kennedy v. Foster, 14 Bush, 479.

4. Contracts of investment securities, and debentures which can not reasonably accumulate a reserve fund equal to the specified endowments within the time specified in contracts, without the aid of lapses and forfeitures, and appropriations of premiums on new business, are deceptive and fraudulent, and intrinsically unequal, and, therefore, against public policy. McLaughlin v. The National Mutual Bond & Investment Company, 64 Fed. Rep., 908; State of Ohio v. Interstate Savings & Investment Company, 64 Ohio St., 283; In re National Indemnity & Endowment Co., 142 Pa. St., 450; State of Louisiana v. New Orleans Debenture & Redemption Company, 26 Southern Reporter,, 586; State of Louisiana v. Louisiana Debenture Company, 26 Southern Reporter, 592; State of Kentucky v. Taylor, 25 Ky. Law Rep.,

5. Where parties to a transaction are to some extent *in pari delicto*, or in some degree affected with the unlawful taint, but not *in pari delicto,* or where the contract is illegal and intrinsically unequal, a court of equity in the furtherance of public policy may aid the one most innocent. Pomeroy on Equity Jur-

isprudence, sections 941 and 942; Tracy v. Talmage, 14 N. Y., 162, 67 Am. Dec., 132.

6. Sufficiency of allegation of fraud.  Newman' Pleading & Practice, pages 262 and 543.

MYERS & HOWARD AND FURBER & JACKSON, FOR APPELLEES.

CLASSIFICATION UNDER RULE 17, AND CASES CITED.

1. A corporation can not be attacked until there is a judicial finding, at the instance of the State, that the corporation is not legally formed, and is without authority to act.  Harrison v. Lexington & Frankfort R. R. Co., 9 B. Mon., 471; Gill v. Kentucky & Colorado Gold & Silver Mining Company, 7 Bush, 539; Hughes v. Bank of Somerset, 5 Littell, 546; Wright v. Shelby Railroad Company, 16 B. Mon., 5; Whitney v. Wyman, 101 U. S., p. 392; Gilbert v. Hole, 2 S. Dak., 165; Building & Loan Association of Dakota v. Chamberlain, 6 S. Dak., 271, etc.; section 3804 of the Statutes of South Dakota; School District No. 61 v. Alderman, 6 Dak., 145, etc.; Wright v. Lee, 2 Dak., 597; Thompson's Commentaries on Corporations, sec. 503.

Cases distinguished:

McLaughlin v. National Mutual Bond & Investment Company, 64 Fed. Rep., 908; State of Ohio v. Interstate Savings & Investment Company, 64 O. S., 283.

2. Appellant can not maintain his action because he participated in the fraud.  Davezac v. Siler, 14 Ky., Law Rep., 497; Farmers Bank v. Unser, 13 Ky., Law Rep., 965; Bispham on Equity, sec. 225, p. 319 (5th ed.); Howard v. Current, 9 B. Mon., 495; Bispham on Equity, sec. 42, p. 67; Dows v. Glasfel, 6 Dak., 257.

3. The corporation attacked was a legal corporation.  Section 3812, Statutes of South Dakota, Kennedy v. Foster's Executor, 14 Bush, 479; State v. Walker, 123 Mo. (1894), p. 56.  Sutherland on Statutory Construction, sections 278, 279, 240, etc.

4. The corporation attacked was at least a *de facto* corporation.  Thompson's Commentaries on Corporations, sec. 503; Cook on Corporations, section 234.

OPINION OF THE COURT BY CHIEF JUSTICE HOBSON—AFFIRMING.

The National Bond & Security Company, incorporated under the laws of South Dakota, was engaged in the business of · selling certain installment bonds, with coupons attached, and appellant invested $1,600 there-

in. The appellees were officers and stockholders of
the corporation. That company, on the 16th of April,
1901, was merged in the National Bond & Security
Company, a corporation formed under the laws of the State
of West Virginia, and this company shortly thereafter be-
came insolvent, and was placed in the hands of a receiver.
Appellant then filed this suit against the appellees, charging
that his money had been procured to be paid to the corpora-
tion by means of false and fraudulent representations which
the defendants made as its officers, and which they knew, or
ought to have known, were untrue; that the corporation
was not legally organized, but was a mere dummy, and that
the scheme upon which the bonds were based could not fi-
nance out; that this he did not know, and that the defend-
ants knew this, or ought to have known it. The circuit court
sustained a demurrer to the petition, and the plaintiff ap-
peals.

The question of the validity of the incorporation of the
company turns upon the statute under which it was formed,
which is as follows: "Purposes of private corporations:
Private corporations can be formed by the voluntary associa-
tion of three or more persons upon complying with the pro-
visions of this chapter, for the following purposes, namely:
Mining, manufacturing, mechanical, quarrying, and other
industrial pursuits, and for any other lawful business; the
construction and operation of railroads, wagon roads, ir-
rigation ditches; for seminaries, colleges, churches, libraries,
benevolent, charitable and scientific associations; banks of
deposit and discount (but not of issue) for loan, trust, and
guaranty associations; provided, however, that no insurance
company shall be incorporated under the provisions of this
act, except by the voluntary association of seven or more
persons." Ann. St. S. D., 1901, section 3812. It is insisted

Vokes v. Eaton, &c..

for appellant that the words "and for any other lawful bus-
iness" must be construed as referring to such corporations
as have been above named, and that the rule of *noscitur a
sociis* should be applied. The difficulty of this is that, after
naming mining, manufacturing, mechanical, and quarrying
purposes, these words are added, "and other industrial pur-
suits." If only things like those which were named were
meant, this would have been covered by the words "and other
industrial pursuits" and the words "and for any other lawful
business" would have been unnecessary. Taking the statute
as a whole, we are satisfied that the words were used in their
broad and natural sense, otherwise corporations for a great
many purposes for which corporations are formed in nearly
all the States could not be formed under the statute, such as
title companies, mercantile companies, holding companies,
and the like. The statute was evidently intended to be
broad in its operation from the fact that so many things are
named, and the words, "and for any other lawful business"
are added to make it include things other than those named.
It is not claimed that the proper steps were not taken to
form the corporation under the act. It is simply claimed
that the act does not authorize the incorporation of such a
company. This, we think, can not be maintained, in view of
the broad language of the act.

But it is also insisted that the company was not incorpor-
ated for a lawful business, and that, therefore, it does not
come within the act. This position is based upon the idea
that the bonds issued by the company contain a scheme
which was in and of itself illegal. The bonds are as follows:
"The National Bond and Security Company, of Covington,
Kentucky, U. S. A.

"By this certificate, does hereby promise to pay Chas. E.
Vokes, or order, upon maturity or redemption of any of the

ten coupons hereto attached, an amount equal to the total deposits made hereon, together with interest at the rate of six and two-thirds (6 2-3) per cent. for the period of ten years from the date of said maturity or redemption.

"The terms and conditions printed on the back hereof and in the application herefor, are a part of this contract as fully as if recited herein.

"In testimony whereof, the said National Bond and Security Company has by its duly authorized officers, signed, sealed and delivered this contract, this the 28th day of January, in the year of 1901.

"[Signed]      GEO. H. DAVISON, President.

"[Signed]      IRVING J. ISBELL, Secretary."

The terms and conditions printed on the back of the bonds or contracts are as follows, to-wit:

"Terms and conditions: This contract is issued to the holder hereof in consideration of a membership fee of ten dollars and an installment of five dollars, and thereafter a monthly installment of fifty cents on each unredeemed coupon until the redemption or maturity. The monthly dues of this contract are due and payable without notice on the first day of each month hereafter, and must be paid on or before the tenth of each month or a fine of ten cents on each coupon will be assessed, and if not paid on or before the twenty-fifth of each month this contract shall become null and void and the holder thereof shall forfeit all payments hereon to the several funds.

"Redemption of coupons: Any coupon of this contract shall be surrendered to the company at any time when called for by the redemption and the holder thereof shall receive for such surrender the guaranteed redemption value at the month in which the redemption shall occur.

"The monthly redemption shall occur after the close of

business of the last day of each month, except where the last day falls on a legal holiday, in which case they shall occur on the day following and shall be determined as follows.

"Seventy-five per cent. of the redemption fund shall be used each month to pay off one coupon on each contract in numerical order commencing the first month with the first coupon on contract number one, and so on in like manner until the first fund is exhausted; commencing each succeeding month with the first coupon on the next contract, following the last one paid the previous month, continuing in like manner each month until the entire list has been passed through, and then reverting back to the lowest numbered coupon in force, and pay off the second coupon on each contract in force in like manner. Twenty five per cent. of the redemption fund shall be used each month to pay off one coupon on each contract in numerical order, commencing each month with the lowest number contract in force.

"Cash surrender or withdrawal value: At any time after thirty-six monthly installments have been paid hereon, the holder hereof may file a withdrawal and receive an amount equal to the total amount previously contributed to the reserve fund plus the estimated earnings to the date of withdrawal, the estimated earnings to be paid from the general redemption fund for the month in which the withdrawal is made, the reserve contributions to be drawn from the reserve fund.

"Loan value: At any time after thirty-six monthly installments have been paid hereon, the holder hereof may, upon depositing this certificate as security, borrow from the reserve fund an amount equal to the cash surrender or withdrawal value hereof, at the month in which the loan was made.

"Paid up value: At any time after thirty-six monthly installments have been paid hereon, the company will at the request of the holder hereof in writing, issue a paid up certificate for the redemption value (in the month issued) due in ten years from the date thereof and payable out of the reserve fund.

"Extended payments: At any time after thirty-six monthly installments have been paid hereon, the company will voluntarily extend the payments due hereon for such a time as the contributions previously made to the reserve fund will pay, and when all the money in the reserve fund as above stated, has been exhausted, the holder hereof shall pay in cash the intallments then due, together with the amounts charged against this certificate as extended payments of this contract shall become null and void and the holder hereof shall forfeit all payments hereon.

"Death benefit: In the event of the death of the holder hereof, the legal representatives may avail themselves of either of the following options:

"First: Continue the installments until redemption or maturity.

"Second: Surrender the same within ten days after the death of the holder hereof, and (upon satisfactory proof of the death being furnished to the company) receive the redemption value for the month in which the death occurred, same to be paid from the general redemption fund at the next redemption following the filing of satisfactory proof.

"Maturity: The coupons on this contract will mature at any time when the contributions in the reserve fund plus the reserve accumulation shall equal the total deposits hereon, with interest at the rate of six and two-thirds (6 2-3) per cent. for a period of ten years; provided, however, that

one hundred and eighteen (118) monthly installments have been paid hereon.

"Division and distribution of funds: Monthly installments when paid are apportioned each month to the several funds as follows:

"Sixty per cent. to the redemption fund and is used each month in retiring coupons.

"Twenty per cent. to the reserve fund which must be deposited each month in such bank or trust company as may be decided on by the board of directors, and can not be drawn for any purpose, except to mature coupons, cash surrender extended payments and for granting loans to be supervised by a committee of three appointed by the board of directors.

"Twenty per cent. to the current expense fund, and shall be used for the expense of the company in conducting its business.

"All moneys received on account of fines, transfer fees and interest earnings on reserve loans shall be placed to the credit of the reserve fund.

"Transfers.: This certificate will be transferred on the books of the company, when all the requirements are complied with, and a fee of one dollar is paid, and the form hereon has been properly filled out.

#### "Financial Schedule.

| No. of Months. | Cost of Coupon. | Estimated Earnings. | Return Value. |
| --- | --- | --- | --- |
| 1 | $1.50 | $1.00 | $2.50 |
| 2 | $2.00 | $1.33 | $3.33 |
| 3 | $2.50 | $1.67 | $4.17 |
| 4 | $3.00 | $2.00 | $5.00 |
| 5 | $3.50 | $2.33 | $5.83 |
| 6 | $4.00 | $2.67 | $6.67" |

It is insisted for appellant that the ordinary investor would never understand the terms of the bond, and

that by the scheme some must be enabled to obtain
more than they had invested, while others receive less; that
it was impossible that all the contract holders should re-
ceive the same return upon the money invested; and that
the scheme, taken as a whole, was deceptive, and gotten up
for the purpose of getting the unwary into a trap. Whether
the scheme would finance out under ordinary conditions we
need not consider. There was nothing of a lottery about it.
The coupons were chosen for redemption in their numerical
order, beginning one month where they left off the month
before. How much the fund would be swelled by lapses no
one could tell. If there was a greater profit on the coupons
which were redeemed than the company could reasonably
make on the money in its hands, this profit went to the in-
vestors on their investment, each bond being taken in its
numerical order each month. To say that this was an un-
lawful business because it was bottomed upon a scheme
which would not finance out would not be to give the words
of the statute their ordinary meaning. A majority of the
schemes for which corporations are formed, it is said, do not
finance out. The cases relied on for appellant are cases
where a receiver was applied for, or some similar rem-
edy was sought, and the court, in using the language relied
on by appellant, was simply determining that the appoint-
ment of a receiver was essential for the protection of the
persons interested. Some of the cases were direct proceed-
ings by the State to annul the charter of the corporation or
revoke its charter. In such cases a very different question
is presented from that in the case before us. The court may
well appoint a receiver for a corporation when the further
conduct of its business would only make its condition more
disastrous, and in a proceeding by the State to revoke the
charter of a corporation great effect could be given the fact

that the tendency of the business was to deceive investors into making an investment which must necessarily disappoint them. But many insurance companies have failed because the scheme of premiums proved insufficient to pay the losses, and it was perfectly apparent in the end that this was the necessary consequence of the false principles on which the scheme was based. Thousands of co-operative companies have gone under, and even yet the proper basis of co-operative insurance is imperfectly understood. A few years ago the boom fever spread all over the country, and numbers of corporations were formed in which thousands of dollars were invested in chimerical schemes which soon failed. But in none of these cases, so far as we have known, were the stockholders or the officers of the company held liable to the investors upon such allegations as are before us. The plaintiff does not charge that the defendants misrepresented any fact to him. Their entire scheme was set out in the bonds which he bought and accepted. It is not charged that there was any misrepresentation as to the terms of the bonds, or that he was misled in any way as to the contract. It is only charged that the defendants represented that the scheme would finance out, when they ought to have known that it would not do so. This was a mere matter of opinion, on which the plaintiff could exercise his judgment as well as they. Puffing by sellers is universal, and every one buys knowing that he must exercise his own judgment on matters of opinion expressed by the seller.

Judgment affirmed.