(*Superior Court of Cook County. In Chancery.*)

## George F. Edmunds, John A. Kason, Stuyvesant Fish and and William H. Emerich.

· vs.

## Illinois Central Railroad Co., Union Pacific Co., Railroad Securities Co., et al.

(February 20, 1908.)

1. CORPORATIONS—STOCKHOLDERS' SUIT—NECESSITY OF PRIOR DEMAND UPON DIRECTORS. Before a stockholder is entitled in his own name to institute and conduct a litigation which usually belongs to the corporation he should show to the satisfaction of the court that he called upon the directors to bring the suit and their neglect or refusal to comply with his request; or he must show that an application to them would have been futile, and therefore useless. Where the stockholder brings such an action the bill should contain an account of such demand and refusal, or should state facts and circumstances showing that such demand would have been an idle ceremony.

2. BILL FOR INJUNCTION—STATEMENTS OF BILL MUST BE SUSTAINED BY FACTS. The rule is that unless the statements of a bill for injunction are sustained by pleaded and proved facts they become the mere conclusions of the pleader, which need not be enforced by the decree of the court. This rule is strictly enforced where fraud or bad faith is charged.

3. EQUITY ACTS ON FACTS, NOT ON FEARS. Courts of equity act on facts alleged and proved, and not on fears, nor even on supposed prophecies.

4. DIRECTORS OF CORPORATIONS ARE PRESUMED TO DO THEIR DUTY. It is to be presumed, until the contrary affirmatively appears, that any man elected as a director of a corporation will do his duty; that he will not knowingly act either singly or in concert with his fellow directors, so as to impair the usefulness of his corporation, or to squander its property; nor to turn it over, bound hand and foot, to the control of another corporation.

5. BILL TO ENJOIN VOTING OF STOCK AT A CORPORATE MEETING. To sustain a bill to enjoin the voting of stock at a corporate meeting, it is not sufficient for the complainants to show merely that the act complained of is a public wrong; they must also show that by the doing of such act they will suffer a special injury to their civil or to their property rights.

6. ELECTION OF DIRECTORS AT A CORPORATE MEETING WORKS NO LE-
GAL WRONG· TO COMPLAINANTS; A MAJORITY OF STOCKHOLDERS
IS ENTITLED TO ELECT A BOARD OF DIRECTORS. This election
of directors at a coming meeting can work no legal wrong to
complainants, and no impending· special injury to them or to
any or to either of them is proved which calls for the inter-
position of this court. It is the clear right of a majority of the
stockholders of a corporation to elect a board of directors that
will carry out its wishes.

7. CORPORATIONS—RIGHT TO VOTE STOCK IS INTEGRAL PART OF OWNER-
SHIP OF STOCK. One who owns stock in a corporation has a right
to vote such stock at any and every lawful meeting of the stock-
holders of the corporation. This right to vote is an integral
and necessary part of ownership, and is as vital as is the right
to receive the dividends lawfully declared upon such stocks.
And at common law when the ownership of stock in a corpo-
ration has been legally acquired such ownership is not a quali-
fied one, and if it is thus owned, whether by an individual or
by a corporation, none of the rights attending ownership lie
dormant or are incapable of being exercised.

8. EVIDENCE—FINDINGS OF INTERSTATE COMMERCE COMMISSION NOT
EVIDENCE IN STATE COURTS. The findings and opinion of the
Interstate Commerce Commission are not evidence in the state
courts; such findings are prima facie evidence only in civil
cases brought in the United States Circuit Court to enforce
an award of damages.

9. SHERMAN ACT—STATE COURTS HAVE NO POWER TO ENFORCE. State
courts have no power to enforce the Sherman act.

10. CORPORATIONS—RIGHT OF ONE STOCKHOLDER TO ENJOIN ANOTHER
STOCKHOLDER IN THE SAME CORPORATION FROM HOLDING OR VOT-
ING STOCK. If a person or corporation has no right to buy,
hold or own stock in another corporation, then any bona fide
stockholder, without alleging irreparable injury, may ask
that the voting or holding of such stock be enjoined.

11. CORPORATIONS—RIGHT OF ONE CORPORATION TO ACQUIRE STOCK IN
ANOTHER. The mere fact that a defendant is a corporation
does not debar it from buying and holding the stock of other
corporations or from enjoying all the rights and privileges
which accompany such ownership.

12. FOREIGN CORPORATIONS, RIGHT OF TO HOLD STOCK IN AN ILLINOIS
CORPORATION. The mere fact that a defendant which has in-
vested in stock in an Illinois corporation is a foreign corpora-
tion does not debar it from holding such stock, for by the
statutes of Illinois many classes of foreign corporations are
expressly empowered to buy stock in domestic corporations.

13. RAILROAD CORPORATIONS—RIGHT TO INVEST IN STOCK OF OTHER RAILROADS. For a railroad company to invest its funds in the stocks of other corporations is not *malum in se,* and in the absence of an express statutory prohibition, or public policy to the contrary in the local jurisdiction of the corporation in whose stock it thus invests, it is not *malum prohibitum.*

14. CORPORATIONS—RIGHT OF ONE CORPORATION TO HOLD STOCK IN ANOTHER CORPORATION. There is not any general rule of American common law that one corporation cannot own stock in another corporation. The rule is that a corporation cannot become a stockholder in another corporation unless power to do so is specifically granted in its charter or is necessarily implied in it.

15. CORPORATION MAY HOLD STOCK IN ANOTHER CORPORATION WHEN EXPRESSLY AUTHORIZED. A corporation may take and hold stock in another corporation whenever it is expressly authorized to do so.

16. CORPORATIONS—STOCKHOLDING CORPORATION MAY BE FORMED UNDER THE LAWS OF ILLINOIS. A corporation may lawfully be formed under the laws of Illinois for the purpose of purchasing, owning and holding shares of capital stock in other corporations.

17. CORPORATION HAVING RIGHT UNDER ITS CHARTER TO OWN CAPITAL STOCK OF AN ILLINOIS RAILROAD CORPORATION HAS RIGHT TO VOTE SUCH STOCK, UNLESS RESTRAINED BY PUBLIC POLICY. The Union Pacific Railroad, under its charter and the laws of Utah, has a clear right to own and hold shares of stock of the Illinois Central which it purchased in 1906. By the laws of comity it had the right, which is an essential part of that ownership, to vote that stock at the meetings of the stockholders of the Illinois Central, unless such right is forbidden by the statutes of this state or by the public policy of this state. Such prohibition does not exist unless it affirmatively appears. It is not established by the mere lack of legislation upon that subject

18. CORPORATION OWNING STOCK IN ANOTHER CORPORATION MAY VOTE SUCH STOCK IRRESPECTIVE OF ITS OWN STOCKHOLDERS. The right of the Railroad Securities Company to vote its stock in the Illinois Central Railroad stands uninfluenced and unimpaired by the fact that the Union Pacific Railroad owns all or practically all of the stock of the Railroad Securities Company. So long as it uses the voting power in a lawful manner and for lawful purposes it is immaterial who owns the stock.

19. PUBLIC POLICY OF A STATE IS FOUND IN STATUTES, DECISIONS OR PRACTICE OF GOVERNMENT OFFICIALS. The public policy of a

state is to be found in the statutes, and when they have not directly spoken, then in the decisions of the courts and in the constant practice of government officials. When the legislature speaks upon a subject upon which it has the constitutional power to legislate, public policy is what the statute passed by it indicates.

20. PUBLIC POLICY OF ILLINOIS IS TO ENCOURAGE THE BUILDING AND MAINTENANCE OF RAILROADS. The uniform public policy of the State of Illinois has been and still is to encourage the building and maintenance of railway lines for the transportation of goods and of passengers. The power to lease, to enter into operative contracts, to consolidate connecting lines, to buy and to sell, has been freely granted; but the public policy of the State is opposed to and forbids the union or consolidation of parallel or competing lines.

21. PUBLIC POLICY OF STATE AS TO HOLDING OF STOCK BY CORPORATIONS NOT SHOWN BY ABSENCE OF LEGISLATION. The public policy of this state as to the right of one corporation to hold stock in another cannot be established by the mere lack of legislation upon that subject. The prohibition does not exist unless it affirmatively appears.

22. FOREIGN CORPORATIONS IN ILLINOIS ARE PLACED UPON EQUAL FOOTING WITH DOMESTIC CORPORATIONS. There is in the law of this state no discrimination against foreign corporations, but they are given a hospitable reception and are placed upon an equal footing with our domestic corporations.

23. PUBLIC POLICY OF ILLINOIS RECOGNIZES THE RIGHT OF A FOREIGN OR DOMESTIC CORPORATION TO INVEST ITS SURPLUS FUNDS IN THE STOCK OF ANOTHER CORPORATION. There is no public policy in this state forbidding a corporation either domestic or foreign (foreign railroad companies not now being considered) from investing its surplus funds in the stock of another corporation. On the contrary such power is recognized or expressly granted in the acts cited. It is only when such investment is made for an unlawful purpose, such as to prevent competition, or to create a monopoly that the law forbids the same. Whether the power exists in any corporation to buy and hold the stock of another company depends on the charter of the purchasing company and on the law under which it is created. Given that power there is no statute in this state which forbids its exercise.

24. FOREIGN CORPORATION ACT OF ILLINOIS OF 1905 NOT RETROACTIVE IN EFFECT. The Illinois foreign corporation act of 1905 was intended to take effect upon causes of action and demands arising after its passage, and upon none other. Statutes are

prospective, and will not be construed to have a retroactive operation unless the language employed is so clear that it will admit of no other construction. Retrospective laws are not looked on with favor.

25. TITLE AND RIGHTS OF CORPORATION NOT AFFECTED BY LACK OF POWER OF ITS STOCKHOLDERS TO EXERCISE SUCH RIGHTS. The title of a corporation to its property and the enjoyment of all the rights going with and making up that title cannot be taken away by showing that any or all of its stockholders had no power to exercise such rights.

26. CORPORATION—LACK OF POWER TO HOLD STOCK NOT AFFECTED BY THE MANNER OF ITS PURCHASE. If a corporation purchasing stock has no power to buy, hold and enjoy the stock it purchases, then whether it buy stock in its own name or through the intervention of individuals or trustees the want of power is the same.

27. CORPORATIONS—PURCHASE OF STOCK OF OTHER CORPORATIONS NOT MALUM IN SE UNDER LAW OF ILLINOIS. The buying by one corporation of stock of another corporation is not *malum in se*. It does not come within any of the exceptions named in the Illinois Corporation act. The legislature of this state, in a series of acts extending over many years, has granted to fire insurance companies, to life insurance companies, to mining and manufacturing companies, to gas companies, to accident insurance companies, to trust companies, and to railroad companies the power to buy, own, hold and enjoy stock of other corporations. If the granting of this power is unlawful in this state, these acts would not have been passed, or, if passed, would have been condemned by the courts.

28. RAILROAD CORPORATIONS—LEGALITY OF STOCKHOLDINGS IN TWO COMPETING RAILROAD CORPORATIONS; TENDENCY TO MONOPOLY TEST OF LEGALITY. A railroad corporation can lawfully hold stock in two roads which are competitors of each other; such holdings do not become illegal until the amount thereof is great enough that by its necessary operation it tends to restrain trade or to create a monopoly and to deprive the public of the advantages that flow from free competition.

29. PRELIMINARY INJUNCTION—OFFICE OF, TO PRESERVE THE STATU QUO. The usual office of a preliminary injunction is to continue the statu quo until the final hearing. Upon the determination of this question, unless the right of the complainants to have the injunction retained is clear, the balance of convenience and inconvenience to the parties litigant has a potent influence.

30. INJUNCTION TO RESTRAIN VOTING OF STOCK AT CORPORATE MEETING. Complainants, stockholders in the Illinois Central Rail-

road filed a bill for an injunction to restrain the Union Pacific Railroad Company and the Railroad Securities Company, and certain individuals from voting stock owned by them in the Illinois Central Railroad at its annual meeting. A temporary injunctional order was granted. Upon motion to dissolve the injunction *held* that the stockholders were proper parties complainant, that the Union Pacific Railroad and The Railroad Securities Company have full ownership of the shares of stock they claimed to own in the Illinois Central Railroad, including the right to vote that stock at the stockholders' meeting; that such right to vote is not forbidden by the statutes of this state nor by the decisions of the supreme court nor by the public policy of Illinois; and that the motion to dissolve the injunction should be allowed.

General No. 263,420. Motion to dissolve injunction restraining defendants from voting stock of the Illinois Central Railroad at the annual stockholders' meeting. Heard before Judge Farlin Q. Ball.. Opinion rendered Feb. 20, 1908.

## STATEMENT OF PLEADINGS AND FACTS BY COURT.

. The bill, filed October 14th, 1907, states:

The names of complainants, and the number of shares of Illinois Central stock owned by each; and

The creation of Illinois Central Railroad Company by special act of the legislature of the state of Illinois, dated February 10th, 1851.

That the Illinois Central owns and operates about 4,459 miles of road in Illinois and in ten other states, and its outstanding capital stock consists of 950,040 shares of the par value of $100 each; and

Names the president and directors of the company.

That the terms of office of directors Hackstaff, Fish, Astor and Harriman expired October 16th, 1907, and a meeting of the stockholders is called to fill such vacancies at Chicago, Illinois, on October 16, 1907.

That the Union Pacific Railroad Company is a corporation of Utah, and owns and controls about 5,588 miles of road in

Utah and in nine other states, and connects with the Illinois Central at Omaha and through the Southern Pacific, which it dominates at New Orleans.

That Edward H. Harriman is a director in the Illinois Central, and is also a director in and president of the Union Pacific, and chairman of the executive committee; and Goelet and Peabody are also directors of the Union Pacific.

That Harriman "by some means unknown to your orators completely dominates and influences" all of the Union Pacific directors, and all of the Illinois Central directors except four; and the directors so dominated "move and act, speak and vote merely to register his will" in all matters concerning both companies.

That under the guidance of Harriman the Union Pacific has been attempting to get control of the Illinois Central in order that it may be operated as a mere feeder for the Union Pacific and not for its own benefit, to the great damage of the Illinois Central and its stockholders;

That this design began to show itself in 1906, when Harriman at the stockholders' meeting, held October 17 of that year, attempted to elect DeForest, then a director of the Southern Pacific, as a director of the Illinois Central; Fish defeated the election of DeForest; and because of this Harriman deposed Fish from the presidency of the Illinois Central, and elected Harahan, who, as president of the Illinois Central, is completely under the control of Harriman.

That in 1906 the Union Pacific purchased 195,000 shares of the stock of the Illinois Central; and also purchased nearly all the stock (Fish selling to Harriman 6,625 shares of the common stock and 11,925 of the preferred stock) of the Railroad Securities Company of New Jersey; using in this last purchase 8,769 shares of the Illinois Central stock, thus reducing the holdings of the Union Pacific in the Illinois Central to 186,231 shares; and

Harriman, Peabody and Goelet kept such proceedings secret until they were revealed in January, 1907, in an investigation

made by the Interstate Commerce Commission, as appears by the report of that body, which report is made a part of the bill.

That in purchasing the Securities Company stock the Union Pacific violated its charter and the laws of Utah, and such ownership is *ultra vires,* and null and void;

That the acquisition of 29.6 per cent. of the Illinois Central stock by the Union Pacific is part of an unlawful scheme in violation of the laws of the United States and of the state of Illinois to control all interstate and foreign commerce of the United States and to eliminate all competition among common carriers by land and by sea; which control the Union Pacific seeks to get by purchases of large blocks of stock in the principal transportation corporations; (then follows the names of the corporations, some of which are competitors of the Illinois Central, in which the Union Pacific has purchased stock, and a report of the Inter-State Commerce Commission setting forth such ownership in detail is made a part of the bill;) and the ownership and control by the Union Pacific of the stock of these competing and parallel lines is *ultra vires,* and the Union Pacific has no right to vote the stock of the Illinois Central for any purpose;

That the Union Pacific by its large holdings of Illinois Central stock practically controls the elections of that company; and the Union Pacific has not had transferred to itself upon the books of the Illinois Central any of the 186,231 shares of the Illinois Central stock it so purchased, but has kept such stock in the names of interposed persons who hold the same for the Union Pacific, (these persons are named); and it is declared that such holdings are void in law;

That the Railroad Securities Company is a New Jersey corporation with power by the second article of its charter to purchase, own and hold shares of capital stock in railway companies, including the right to vote thereon; prior to September 18, 1907, said company held 95,000 shares of the capital stock of the Illinois Central, its only assets except cash, and on that day 15,000 shares were transferred to E. H. Har-

riman and others (who are named); these transfers were made so as to permit such persons to vote at the then coming annual meeting of the Illinois Central, and such transfers are void in law.

Refers to the Mutual Life Insurance Company, (which has been dismissed out of the case).

That the Union Pacific and the Securities Company have not nor has either of them any right to own or hold or vote stock of the Illinois Central, either in their own names or in the names of the interposed persons.

That complainants made no application to the Illinois Central to bring this suit, because, first, they are advised that they have such right as individual stockholders; second, it would have been an idle ceremony to have made such application; (a) eight of the thirteen directors of the Illinois Central believe and hold that the Union Pacific and the Securities Company have and each of them has a legal and moral right to vote the stock they severally hold, and that to bring such a suit would injure the Illinois Central and other large business interests; (b) Directors Harriman, Goelet and Peabody are also directors in the Union Pacific, and have participated in the unlawful schemes set forth in the bill, and would not have permitted the suit to be brought, and five other of the directors, Astor, Hackstaff, Harahan, Vanderbilt and Auchincloss would have been advised by Harriman to vote against bringing suit and would have followed such advice; (c) eight of said directors are personally hostile to Mr. Fish, and therefore would have voted against the bringing of the suit, and also because they feared that if the Union Pacific and the Securities Company were not permitted to vote, Fish would cause himself to be elected, and they to be defeated for re-election when their terms expired.

That it is the intention of the Union Pacific and of the Securities Company to vote all of said stock in pursuance of the design of the Union Pacific to dominate the Illinois Central, and to control and dominate inter-state, intrastate and foreign commerce of the United States, and to eliminate all

competition among common carriers, and to these ends they will vote at the coming meeting to re-elect as directors, Harriman, Astor and Hackstaff, who are under the domination and control of Harriman and for some fourth person to be selected by Harriman; and said stock will be voted at subsequent elections so as to eliminate all not under the influence of the Union Pacific, whereby the Union Pacific will succeed *pro tanto* in carrying its illegal purpose into effect, contrary to the laws and public policy of this state and to the great and irreparable damage and injury of complainants; and it is the intention of the officers of the Illinois Central to permit such stock to be so illegally voted, and complainants have no remedy except in a court of equity.

Prays that an injunction issue preventing the defendants, who are named, from permitting the Union Pacific and the Securities Company to vote said stock whether held in the names of said companies or in the names of interposed persons, at the coming annual meeting or any adjournment thereof; and that the Union Pacific and the Securities Company and each of them refrain from voting such stock; that the injunction be made perpetual; that it may be decreed that neither the Union Pacific nor the Securities Company has any right to vote any stock it may own of the Illinois Central at any meeting of the stockholders of the latter company; that said stock held by others for the Union Pacific and for the Securities Company may be decreed to belong to said companies respectively, and that their purchases of said stock be declared null and void, and said companies be ordered to sell the same; prayer for process; and general prayer for relief.

The bill was verified by Mr. Fish. He also made an affidavit alleging that as the defendants were non-residents and the date of the annual meeting of the stockholders of the Illinois Central was but two days away, it was impossible to give personal notice to them.

Upon the filing of a bond in the sum of $10,000, a preliminary injunction, as prayed for in the bill, was issued.

The next day the parties came before the court, and as the time intervening between them and the date of the annual meeting was not sufficient for a proper discussion and decision of the questions involved in the motion then made to dissolve the injunction, by agreement of the parties, an order was entered, providing that the meeting should go on, but if at such meeting it appeared that the counting of the votes of the enjoined stock would make a difference in the result of the election, then the stockholders' meeting should be adjourned to December 18th, 1907.

During the progress of the meeting it did appear that the votes of the enjoined stock were necessary to an election, and thereupon the meeting was adjourned to December 18th, 1907.

When that day came counsel were in argument upon a motion to dissolve the injunction, and for that reason the meeting was postponed to March 2nd, 1908.

The Union Pacific filed its answer to the bill, in which it admits the preliminary averments of the bill; states that the lines of the Illinois Central are connecting lines, and are not parallel or competing with any of the lines of the Union Pacific or of the Southern Pacific. Denies all domination by Harriman, as averred in the bill, or that it is attempting to get control for its own purposes of the Illinois Central.

Asserts that by the terms of its charter it has power to buy and hold stock in the Illinois Central, and such purchases are not in violation of law; that it is in position to give much of its Eastern tonnage to the Illinois Central or send it over rival lines; that Fish recommended the construction of the line which connects the Illinois Central with defendant's road.

Admits the purchase by it in 1906 of 186,231 shares of the stock of the Illinois Central, which it yet holds as beneficial owner, the stock standing in the names of firms and individuals mentioned in the bill; denies that such stock was put in those names for the purpose of concealment, but says the stock so stood when it was bought, and it was so left, as is the

28

custom, and for convenience in handling; admits in September, 1906, it bought 15,000 other shares from the Securities Company and had the title placed in the names of the persons mentioned in the bill.

Says that at the Illinois Central stockholders' meeting of 1906, DeForest was elected a director for no other reason than that he was a man of ability, integrity and independent character; and at such meeting Harahan was elected president over Fish, but not for any of the reasons stated in the bill; the directors regarded Fish as not a fit man for the presidency and Harahan as the better man; and no change has since been made in the traffic arrangements between the Illinois Central and this defendant or the Southern Pacific, and no change has been made in the executive officers of the Illinois Central, except one occasioned by death.

Denies it acquired this stock in the Illinois Central as part of a scheme in restraint of commerce or in violation of the law of this state, or that it is seeking to get, by the purchase of large blocks of stock of transportation companies the control of such companies.

Avers that the ownership by the defendant and by the Oregon Short Line of the stock of other corporations has been public and is not in violation of any law.

Asserts it is not required to answer Exhibit A, the Interstate Commerce Commission Report, as it is immaterial.

Admits that in 1904 it acquired 103,431 shares of the stock of the Chicago & Alton Railway Company out of 399,861 shares, but that it never had stock enough to control the Alton, and never did absolutely control it; the pooling arrangement with 191,000 other shares of the Alton was abrogated in June, 1907; and before the bill was filed the Toledo, St. Louis & Western Railway Company bought more than a majority of the stock of the Alton, and now completely controls and dominates such last named road, and at the annual meeting of 1907, the defendant did not elect a single director in the Alton.

Explains the ownership in stock of the Chicago & North-

Western and in the Chicago, Milwaukee & St. Paul, and says such holdings are insignificant and not acquired for the purpose of influencing and controlling either of such companies.

Denies that its stock ownership in the Illinois Central is *ultra vires*, or that such stock was acquired for the purpose of limiting competition between it and the Illinois Central, or that its acquisition had any such effect, and since it had a chance to vote on such stock it has had no control over the Alton, the North-Western or the St. Paul Company.

Avers that by the charter of the Illinois Central its stock is personal property, and by virtue of a by-law adopted in 1851 all transfers on its books have been made in the city of New York; and all the stock held by the defendant was bought by it in such city and there delivered to it and is still there in the possession of the defendant.

Avers that Fish is a candidate for director and president of the Illinois Central, and this bill was filed in order that a minority of the stockholders might elect him, and he be given control of the corporation; that this defendant proposes to vote its stock for the re-election of Harriman, Hackstaff and Astor, and a fourth person who is honest and able and not identified with the Union Pacific in any way; and Fish has shown himself to be a person unfit to be a director.

Avers that its stock in the Illinois Central is of great value, and one important element of its value is the right to vote it; such right is a property right, which it has the right to exercise in this state.

Directors Astor, Hackstaff, Auchincloss, Vanderbilt and Harahan filed their joint and several answer.

They aver that Fish is a director of the Missouri Pacific Railway Company and is a member of its executive committee; and that such Missouri Pacific is a direct competitor with the Illinois Central; and they set out much in detail why they did not support Fish for president in 1906.

They say Fish was for many years a stockholder in the Securities Company, assisted in organizing it, and has for many years voted its stock as its proxy; Edmunds and Kasson for

many years owned and voted stock in the Illinois Central and have known and acquiesced and ratified the right of the Securities Company to vote, and are thereby estopped; Emrich bought his five shares of stock from persons who had approved the ownership of its stock by the Securities Company, and he is thereby estopped; and Harahan states he will vote for such persons as in his judgment are best qualified to serve the best interests of the Illinois Central.

The answer of the Railroad Securities Company among other things—

Avers that it is an investment company, organized under the laws of New Jersey, and its powers as a corporation are correctly set forth in the bill of complaint and its charter, therein referred to; that in 1900 it bought of Fish and his associates about 80,000 shares of the capital stock of the Illinois Central, and for the stock then sold to it by Fish it paid him $2,650,000, and all of such stock was forthwith registered upon the stock books of the Illinois Central in the name of this defendant, and ever since it has been the registered owner and holder of many thousands of shares of the Illinois Central stock, and has, with the knowledge and acquiescence of all other stockholders, exercised all the rights of ownership; in March, 1901, it purchased and paid for 7,747 other shares of such stock; in December, 1901, it purchased and paid for 16,000 other shares of said stock; in December, 1902, it purchased and paid for 19,200 other shares of such stock, and at each annual meeting it has voted its registered stock through Fish as its proxy.

(The answer then repeats the statements made in the answer of the Union Pacific as to the candidacy of Fish and his efforts in that regard.)

That Fish, from 1900 to November 12, 1906, owned about one-third of the stock of the defendant company, and was a director thereof from 1901 to December, 1906, and also its vice-president from 1902 to December, 1906.

Sets up the deposit of 80,000 shares of its Illinois Central stock with the United States Trust Company, the issue of the

same amount of Illinois Central Stock Interest Certificates, which have been widely sold, and all now in the hands of numerous investors in reliance upon the right of this defendant to own and to vote such stock; the complainants or the previous owners of the shares of stock now held by them, knew all these things, as did the Illinois Central and all its stockholders; therefore complainants have acquiesced in and ratified the right of this defendant to own and vote its said stock, and are estopped to deny the same;

Avers that it proposes to vote its said stock at the coming meeting against Fish and for the re-election of Astor, Harriman and Hackstaff as directors of the Illinois Central, and for a fourth man who shall be honest, independent and not connected with the Union Pacific, and

Avers its right to vote the said stock is an important element in the ownership thereof; it is a property right; and its right of ownership and of voting is not in contravention of any law of this state.

The answer of Illinois Central Railroad Company, among other things, denies that Edward H. Harriman completely dominates and influences any of the directors of that company and denies that any of said directors is so under the influence of Mr. Harriman that he moves, acts, speaks and votes merely to register his will in all matters concerning said Union Pacific Railroad Company and said Illinois Central Railroad Company. It avers that in no transaction of any kind between said two companies has any director of the Illinois Central Railroad Company voted prejudicially to its interest; that there have been no contracts or dealings brought, within the last two years, before said board for action, that the only dealings between said two companies have been agreements for connecting their tracks and the use of the station of the Union Pacific Railroad Company at Omaha, both of which were negotiated and recommended by Mr. Fish, and for interchange of traffic and division of rates, and that in respect of these, no change has been made or proposed within the last year. It denies that a stockholder owning and

controlling the proportion of the capital stock alleged to be owned and controlled by the Union Pacific Railroad Company can entirely control a stockholders' meeting of the Illinois Central Railroad Company, because such a holding is a minority and could be completely paralyzed by the outstanding majority. In respect to the allegations of section 19A, the answer admits that complainants made no application to the board of directors of the Illinois Central Railroad to bring the suit. It denies that is a sufficient excuse for not making such application. The answer avers that the suit is one which concerns all of the stockholders as a body, and that the company, as representing all the stockholders, could have brought such a suit in its own name. It denies that it would have been an idle ceremony to have made such application. It denies that a majority of said board believed, held and maintained when said suit was brought, and that they had been advised that said Union Pacific Railroad Company and said Railroad Securities Company had each a moral or legal right to hold and vote all or any part of said stock, and that therefore they would have regarded the bringing of such suit as a groundless and vexatious action, and that they had been advised, informed and believed that the bringing of such a suit would injure large interests throughout the country, and corporations in which they were stockholders, bondholders or directors, or that it would injure the Illinois Central Railroad Company. It avers that no such question arose in any way or was presented for consideration, before this suit was brought, and that the bringing of the suit was a surprise to said directors, and for the first time presented to their minds the questions involved in it, and that they had, when this suit was brought, been given no advice upon the subject, had not considered it, and had formed no opinion or judgment as to the propriety or right of bringing it, or what effect the bringing of such a suit would have upon their interests, or those of the Illinois Central Railroad Company. It does not admit that the fact that Messrs. Harriman, Peabody and Goelet are directors and stockholders in the Union

Pacific Railroad Company would preclude them from form-
ing a just opinion and acting justly upon a question of that
character, if properly presented to them in their capacity of
Directors of the Illinois Central Railroad Company. It de-
nies that Messrs. Astor, Hackstaff, Harahan, Vanderbilt and
Auchincloss would not have voted for any resolution to bring
such suit if earnestly advised, solicited and directed by said
Harriman not to do so, and says they would have voted in
the negative only if it appeared from the facts presented to
the board that it would not have been for the interests of the
Illinois Central Railroad Company to have such suit brought.
It denies that any or all of said directors of the Illinois Cen-
tral Railroad Company are intellectually or otherwise abso-
lutely under the influence, control and domination of said
Harriman, and that they have always followed his advice,
opinion, suggestion and direction in all matters which come
for consideration before said Board of Directors of the Illi-
nois Central Railroad Company. It avers that said Harri-
man never at any time advised, solicited or directed said di-
rectors, or any of them, against the bringing of any such suit.
It then shows the length of the respective terms of office and
the number of shares of stock held by Directors Astor, Hack-
staff, Harahan, Vanderbilt, Auchincloss and Harriman. It
denies that there is such personal hostility of eight of the
directors of the Illinois Central Railroad Company toward
Mr. Fish as would have made them vote against any resolu-
tion or direction to bring this suit, or any suit having a sim-
ilar object. It avers that much of the hostility now existing
between said directors and said complainant has been engen-
dered by this suit and the charges made in it by said com-
plainant against said directors. It avers that there is no hos-
tility on the part of said directors toward any of the other
complainants, and that there was not and now is not any such
hostility to complainant Fish as would make them disregard
their duty as directors upon any matters properly presented
for their consideration, even though proposed by said com-
plainant. It avers that no such question as voting said stock,

or such plan of said complainant Fish to exclude the voting of same at the instant and succeeding stockholders' meetings and thereby control and vote the majority of the stock so as to oust said directors, arose prior to the filing of this suit, and that no such consideration was apparent when the directors should have been applied to to bring suit, and avers that the allegations in said paragraph show no sufficient reason for not applying to the board of directors of the company to authorize the bringing of this suit. It denies that irreparable injury can or will come to the Illinois Central Railroad Company, or its stockholders, from re-electing said directors, Harriman, Astor and Hackstaff. It points out that the bill does not show that any action is about to be taken, or that any is imminent or contemplated, of any character affecting its relations with the Union Pacific Railroad Company, and that no irreparable injury is in any manner shown, and avers that if at any time the directors of the Illinois Central Railroad Company should take or be about to take any action which would be prejudicial to the interests of said company, the courts can enjoin or nullify such action.

Affidavits of defendants Astor, Hackstaff, Harahan, Vanderbilt and Auchincloss show:

1. Each denies that he is dominated by Harriman.

2. Each says that in no transaction between the Union Pacific and the Illinois Central has he voted against the interests of the latter company. That within two years no contract between the two companies has been brought before the board of directors of the Illinois Central; and the only dealings between them have related to track connections and station privileges, both of which were negotiated and recommended by Fish; and that as to traffic and rates no change has been made or proposed within the last year.

3. Denies that an application to the company to bring this suit would have been an idle ceremony. (Then follows, substantially in the language of the answer of the Illinois Central, a detailed denial of the charges in that behalf contained in the bill.)

4. Each states the time he has been a director or officer of the Illinois Central, and the number of shares of stock he holds.

5. Denies that he has any hostility towards Fish or any of the other complainants that would have made him disregard his duty to the Illinois Central.

6. Says that no question as to voting this stock or to exclude the same arose prior to the filing of this suit.

7. Denies that any irreparable injury can or will come from his re-election as a director of the company.

Affidavits of Harriman, Goelet and Peabody show:

Goelet and Peabody deny that they are dominated by Harriman. Harriman denies that he dominates or influences any of the directors of the Illinois Central as charged.

Repeats paragraphs 2 and 3 of the Astor *et al.* affidavit.

Each says the fact that he is a director of the Union Pacific does not preclude him from acting justly towards the Illinois Central.

Goelet and Peabody each denies that he is under the influence of Harriman, or that he has acted in any manner than in accordance with his own judgment.

Harriman denies that he ever advised any director of the Illinois Central to vote against the bringing of any such suit.

Repeats paragraphs 5, 6 and 7 of the Astor *et al.* affidavit.

Affidavit of Walter Luttgen substantially repeats paragraphs 1, 3 and 6 of the Astor *et al.* affidavit.

For reasons given in the opinion filed herein the report of the interstate commerce commission is not abstracted. Other affidavits were filed by the contending parties as to what occurred between them from the summer of 1906 down to the close of the argument; but, as they are not vital to the present motion, they are not abstracted.

Mr. Fish files an affidavit stating that when he voted the Securities Company stock he always believed he had a legal right to so vote until advised to the contrary in September, 1907. Mr. Emrich by affidavit shows that the Union Pacific now owns all of the stock of the Securities Company, except 45.2 shares.

BRIEF OF COMPLAINANTS.

*Henry W. Leman, Edgar F. Farrar* and *Frank H. Culver,* attorneys for complainants.

## I.

As the Union Pacific Railroad Company owns and controls every share of stock in the Railroad Securities Company, the latter disappears as a factor in this case, and if the Union Pacific Company, on grounds of public policy, cannot directly hold or vote stock in the Illinois Central Company, it cannot do so indirectly through a holding corporation of which it is the sole stockholder. *Morris v. Pugh,* 3 Burr. 1243; Morawetz on Private Corporations (2nd Ed.) 1; *State v. Standard Oil Co.,* 49 Ohio St. 137; *People v. North River Sugar Refining Co.,* 121 N. Y. 582; *United States v. Milwaukee Refrigerator Transit Co.,* 142 Fed. 247, 252; *Southern Electric Securities Co. v. State,* 44 South. 785; *Ford v. Chicago Milk Shippers' Asso.,* 155 Ill. 166; *Stockton v. Central R. R. Co.,* 50 N. J. Eq. 52; *Central R. R. Co. v. Penn. Co.,* 31 N. J. Eq. 475.

(a) Where a corporation cannot hold and vote stock in another company in its own name, it cannot do so in the name of interposed persons. *Clark v. Central R. R. of Ga.,* 50 Fed. 338; *Great Eastern Ry. v. Turner,* L. R. 8 Ch. 149; *Central R. R. Co. v. Pa. R. R. Co.,* 31 N. J. Eq. 475; *Marble Co. v. Harvey,* 92 Tenn. 115; *Mack v. DeBardeleben,* 90 Ala. 396; *Campbell v. Poultney,* 6 Gill. & J. 94; *State v. Hunton,* 28 Vt. 594; *Martin v. Ohio Stove Co.,* 78 Ill. App. 105; *Union Traction Co. v. Chicago,* 199 Ill. 629; *Buie v. Chicago, etc., R. Co.,* 55 L. R. A. 861.

## II.

Under the law and public policy of the State of Illinois the Union Pacific Railroad Company is without power to hold and vote stock in the Illinois Central Railroad Company.

1. The general rule of the American common law that one corporation cannot own stock in another corporation prevails in Illinois. Departures from that rule are permitted in

specific cases by specific statutes, but these departures confirm and do not overthrow the rule. *People v. Pullman Car Co.*, 175 Ill. 159; *People v. Chicago Gas Trust Co.*, 130 Ill. 268, 286; *McCoy v. World's Columbian Exposition*, 87 Ill App. 605, 607, 186 Ill. 356, 360; *Martin v. Ohio Stove Co.*, 78 Ill. App. 105, 108; Veto Message of Governor Fifer of Illinois to bill allowing certain corporations to hold stock in railroad companies, 1891.

The prevailing doctrine in America is that one corporation cannot become a stockholder in another corporation unless power to do so is specifically granted in its charter or necessarily implied from it. *Hafer v. N. Y. L. E. & W. Ry.*, 14 Weekly Law Bul. 68; *Milbank v. New York, etc., Ry. Co.*, 64 How. Pr. 20; *Parsons v. Tacoma, etc., Ry. Co.*, 25 Wash. 492; *Pearson v. Concord R. R. Co.*, 62 N. H. 537; *Central R. R. v. Collins*, 40 Ga. 582; *Hazelhurst v. Savannah Ry. Co.*, 43 Ga. 13; *Central R. R. of N. J. v. Pa. R. R.*, 31 N. J. Eq. 475; *Elkins v. Camden, etc., R. R.*, 36 N. J. Eq. 5; *Deny Hotel Co. v. Schram*, 6 Wash. 134; *McGinnis v. Mining Co.*, 75 Pac. 89; *Railway Co. v. Iron Co.*, 46 Ohio St. 44; *Easen v. Buckeye Brewing Co.*, 51 Fed. 156; *Franklin Bank v. Commercial Bank*, 36 Ohio St. 350; *Sumner v. Marcy*, 3 Woodbury & Minot, 105; *N. O. S. S. Co. v. Ocean Dry Dock Co.*, 26 La. Ann. 175; *State v. Newman*, 51 La. Ann. 833; *Lester v. Bemis Lumber Co.*, 74 S. W. 518; *McCampbell v. Fountain Head R. R.*, 77 S. W. 1070; *Franklin v. Lewiston Inst.*, 68 Me. 43; *Marbury v. Ky. Union Land Co.*, 62 Fed. 335; *Marble Co. v. Harvey*, 92 Tenn. 115; *DeLavergne Co. v. German Savings Inst.*, 175 U. S. 40; *Central Transportation Co. v. Pullman Co.*, 139 U. S. 24; *California Bank v. Kennedy*, 167 U. S. 362, 367; *First National Bank of Converse*, 200 U. S. 425, 429; *Coler v. Tacoma Ry. & Power Co.*, 65 N. J. Eq. 351; Cook on Corporations (5th Ed.) p. 679; Green's Brice's Ultra Vires, p. 95; 1 Yale Law Journal ("Voting Trusts"); *First Nat'l Bank v. Nat'l Exchange Bank*, 92 U. S. 122, 128; Wood on Railroads, sec. 174; *Thomas v. R. R. Co.*, 101 U. S. 83; *Oregon Ry. v. Oregonian Ry.*, 130 U. S. 22; *Am. Loan & Tr. Co. v. M. & N. Co.*, 157 Ill. 641.

2. The law and public policy of Illinois prohibit one railroad company from owning stock in another corporation. To this rule there are two strictly limited exceptions. Sec. 13, General Railroad Incorporation Act of Ills. Nov. 5, 1849; sec. 14, General Railroad Incorporation Act of Ills. 1872; Amendment of 1891 to sec. 14, R. R. Inc. Act of 1872; Act of Jan. 1, 1875 (Union Depot Corporations) Hurd's 1906 Stat. 1575.

(a) From 1854 to 1874 the public policy of Illinois was to permit the consolidation of foreign and domestic connecting lines. Act of Feb. 28, 1854, specifically repealed by specification No. 237 of Act of Mch. 31, 1874; *Am. Loan & Trust Co. v. M. & N. Co.*, 157 Ill. 641; Ratificatory Act of June 4, 1897, Hurd's 1906 Stat. p. 1607; Act of May 27, 1907 (Laws 1907) p. 473; Act June 14, 1883 (Laws 1883 p. 124) Hurd's 1906 Stat. pp. 1573, 1606, 1611; *L. & N. Ry. v. Kentucky*, 161 U. S. 684; *Mackintosh v. Flint & P. M. Ry. Co.*, 34 Fed. 614; *Elkins v. Camden & A. Ry.*, 36 N. J. Eq. 12; *Hafer v. N. Y., L. E., etc., Ry. Co.*, 14 Wkly. Law Bul. 66.

3. The Union Pacific Railroad Company as a foreign corporation, has no greater rights in Illinois to own stock in an Illinois Railroad Company than a domestic railroad company of that state would have. *Carroll v. City of East St. Louis*, 67 Ill. 571, 577, 578; *Bank of Augusta v. Earle*, 13 Pet. 519; *Runyan v. Coster*, 14 Pet. 122; *Hazelton Boiler Co. v. Tripod Boiler Co.*, 142 Ill. 505; *Harding v. Am. Glucose Co.*, 182 Ill. 551, 616; *Stevens v. Pratt*, 101 Ill. 217; sec. 26, General Incorporation Act of Illinois, Hurd's Rev. Stat. 1906, p. 501; *Barnes v. Suddard*, 117 Ill. 237; *Pennsylvania Co. v. Bauerle*, 143 Ill. 459; *Granite Asso. v. Lloyd*, 145 Ill. 620; *People v. Van Cleave*, 187 Ill. 125; Illinois Foreign Corporation Act of 1905; *Matter of Bronson*, 150 N. Y. 1; *Southern Electric Co. v. State*, 41 So. 791; *Female Academy v. Sullivan*, 116 Ill. 382, 384; *Farmers' Loan & Trust Co. v. Elevated R. R. Co.*, 173 Ill. 439; *People v. Van Cleave*, 187 Ill. 125; *North·Am. Ins. Co. v. Yates*, 214 Ill. 272; *Franklin Life Ins. Co. v. People*, 200 Ill. 619; *Hannibal & St. J. R. Co. v. Crane*, 102 Ill. 249; *Mead v. Davies*, 84 Ill. App. 558; *Parsons v. Tacoma Smelting & Refining Co.*, 25 Wash. 492; *Coler v. Tacoma Ry.*

*& Power Co.,* 64 N. J. Eq. 131, reversed in 65 N. J. Eq. 347,. 351; *People v. Chicago Gas Trust,* 130 Ill. 294.

(a) Negligence in enforcing the statute by government officers is no defense to this suit. *Northern Securities Case,* 193. U. S. 279.

4. It is against the public policy of the State of Illinois for one railroad company to hold stock at the same time in parallel and competing lines within its limits, and hence under the conceded facts of this case the attempt of the Union Pacific Company to acquire stock in the Illinois Central Company was *ultra vires* and void by the law of Illinois.

All combinations, trusts or monopolies are prohibited by the laws and decisions of Illinois. Hurd's Statutes Ch. 38, sec. 269; *Harding v. American Glucose Co.,* 182 Ill. 551; *People v. Chicago Gas Trust Co.,* 130 Ill. 268; *Martin v. Ohio Stove Co.,* 78 Ill. App. 105.

All purchases, consolidations or leases of parallel and competing lines of railroad are specially prohibited. Constitution, art. XI, sec. 11; Hurd's Statutes, sec. 57, ch. 32, p. 509; sec. 23, ch. 114, p. 1569; sec. 39, ch. 114, p. 1572; secs. 42 and .47, ch. 114, p. 1573; secs. 196 and 197, ch. 114, pp. 1606-7; sec. 218, ch. 114, pp. 1611-12; *Northern Securities Co. v. United States,* 193 U. S. 197, 275, 332; *Chicago, etc., Coal Co. v. People,* 114 Ill. App. 75; *Dunbar v. American Tel. Co.,* 224 Ill. 9; *Bigelow v. Calumet & Hecla Co.,* 155 Fed. 869; *Central Ohio Salt Co. v. Guthrie,* 35 Ohio St. 672; *L. & N. R.. Co. v. Kentucky,* 161 U. S. 698; *Interstate Commerce Com'n v. Harriman,* 157 Fed. —— (Jan. 15, 1908).

5. The Union Pacific Railroad Company has no right to hold and own stock of the Illinois Central Railroad Company as part of an unlawful scheme to suppress competition in. violation of the anti-trust laws of the United States. *Northern Securities Co. v. United States,* 193 U. S. 197; *Bigelow v. Calumet & Hecla Co.,* 155 Fed. 869.

### III.

The Railroad Securities Company has no power to own or vote stock in the Illinois Central Railroad Company. *Ditt-*

*man v. Distilling Co.,* 64 N. J. Eq. 537; *Carroll v. East St. Louis,* 67 Ill. 571; *People v. Chicago Gas Trust,* 130 Ill. 286, 293, 295; *Oregon Ry. Co. v. Oregon Ry. Co.,* 130 U. S. 22; *N. O. & Carrollton R. R. v. City,* 34 La. Ann. 441; *Fertilizing Co. v. Hyde Park,* 97 U. S. 666.

#### IV.

There is no estoppel, laches or acquiescence, against complainants in favor of the Railroad Securities Company. *George v. Central R. R.,* 101 Ala. 607, 619; *State ex rel. v. Newman,* 51 La. Ann. 833; *State v. Port Royal Ry.,* 45 S. C. 470, 472, 483; *Durkee v. People,* 53 Ill. App. 396, affd. 155 Ill. 354; *People v. Brown,* 67 Ill. 435; *Holcomb v. Boynton,* 151 Ill. 275; *Campbell v. Goodall,* 54 Ill. App. 26; *Brant v. Virginia Coal & Iron Co.,* 93 U. S. 335.

No estoppel can arise against the complainants, because the claimed rights of defendant are *ultra vires* in the true sense. *National Home Building Asso. v. Home Savings Bank,* 181 Ill. 35; *California Bank v. Kennedy,* 167 U. S. 362, 367; *DeLavergne Co. v. German Savings Bank,* 175 U. S. 59; *First National Bank v. Converse,* 200 U. S. 425; *Merchants' Nat. Bank v. Wehrman,* 202 U. S. 295; *Thomas v. R. R. Co.,* 101 U. S. 83.

#### V.

The complainants have the right to maintain this bill. Where a corporation *ultra vires* has acquired a majority of the stock in a corporation, any stockholder has the equitable right to maintain a bill in his own right to restrain the voting of such stock. *Perry Co. v. Stebbins,* 66 Ill. App. 427; reversed in *Stebbins v. Perry Co.,* 167 Ill. 567; *Dunbar v. American Tel. Co.,* 224 Ill. 9, 26; *Bigelow v. Calumet & Hecla Co.,* 155 Ill. 879; *Taylor v. So. Pac. Co.,* 122 Fed. 147; *Lucas v. Milliken,* 139 Fed. 866; *Higgins v. B. & O. R.,* 99 Fed. 641; *Milbank v. N. Y., L. E. & W. R. Co.,* 64 How. Pr. 20; *Hafer v. N. Y., L. E. & W.,* 14 Wkly. Law Bul. 68; *Parsons v. Tacoma Ry. Co.,* 25 Wash. 92; *Hilles v. Parish,* 14 N. J. Eq. 380; *Campbell v. Poultney,* 6 Gill & J. 94; *Webb v. Ridgely,* 38 Md. 364.

## VI.

The motives actuating the complainants to bring the bill are immaterial, if they have the right to bring it. *Stone v. Kellogg,* 62 Ill. App. 444, affirmed, 165 Ill. 192; *Mexican Co. v. Mexican Co.,* 61 Ill. App. 354; *Missouri Ry. Co. v. Flannigan,* 47 Ill. App. 322; *Elkins v. Camden R. R.,* 36 N. J. Eq. 5; *Toler v. East Tenn. R. R.,* 67 Fed. 168, 177; *Ramsay v. Gould,* 57 Barb. (N. Y.) 398, 402; Cook on Corporations (4th ed.) pp. 1893, 1894; Morawetz, Private Corporations (2nd ed.) secs. 260, 266.

## VII.

The bill does show an impending injury to the complainants, it is not premature, and makes a case for an injunction both preliminary and final. *Fleischman v. Young,* 9 N. J. Eq. 620; *Young v. Grundy,* 6 Cranch, 51; Beach on Injunctions, secs. 286, 287, 290, 307, 308; *Boston Franklinite Co. v. N. J. Zinc Co.,* 13 N. J. Eq. 215; *Lowe v. Board of Com'rs,* 70 N. C. 532; *Murray v. Elston,* 23 N. J. Eq. 127; *Marshall v. Com'rs,* 89 N. C. 103; *Hatch v. Tel. Co.,* 93 N. Y. 640; *Hudson River Co. v. Watervelt T. & R. Co.,* 121 N. Y. 397; *Young v. Roundout Gas. Co.,* 129 N. Y. 57; *Chetwood v. Brittan,* 1 Green Ch. R. 439; *Bigelow v. Calumet & Hecla M. Co.,* 155 Fed. 881; *Jones v. Lemly,* 2 Iredell's Eq. (N. C.) 278; *Miller v. Washburn,* 3 Iredell's Eq. (N. C.) 161; *Atty. Genl. v. Pres. Direc., etc., Oakland Co. Bk.,* Walker's Ch. (Mich.) 90.

The preliminary injunction should not be dissolved where it appears that irreparable injury will be done the complainant, if the court does not continue the injunction if already issued, or grant one on proper application. *Troy v. Normant,* 2 Jones' Eq. 318 (55 N. C. 318) (1856); *McBrayer v. Hardin,* 7 Iredell's Eq. 1; *Purhell v. Daniel,* 8 Iredell's Eq. 8; *Marshall v. Com'rs, etc.,* 89 N. C. 103; *Lowe v. Com'rs, etc.,* 70 N. C. 532; *Lloyd v. Heath et al.,* Busbee's Eq. (N. C.) 39; *Commonwealth v. Pittsburg & C. R. R. Co.,* 24 Pa. St. 159; *Sacramento v. So. Pac. R. R. Co.,* 155 Fed. 1022; 125 Ill. App.

631; *Stroup v. Chalcroft*, 52 Ill. App. 608; *Curlson v. Koerner*, 226 Ill. 15; *Lloyd v. Catlin Coal Co.*, 210 Ill. 460; *Wahle v. Reinbach*, 76 Ill. 332; *Newell v. Sass*, 142 Ill. 104; *Field v. Barling*, 149 Ill. 556.

Where the grounds for equitable relief depend upon questions of law, constitutional questions, or delicate and novel questions of law, not thoroughly settled, or where the dissolution of an injunction granted, would lead to a multiplicity of suits, the preliminary injunction will be continued until the final hearing. *Snyder v. Seeman, et al.*, 41 N. J. Eq. 405 (1886); *Camden & A. R. Co. v. Atlantic City P. R. Co.*, 26 N. J. Eq. 69; *Blindell v. Hagen*, (C. C.) 54 Fed. 40; *Harriman v. Northern Securities Co.*, 113 Fed. 464; *McBrayer v. Hardin et al.*, 7 Iredell's Eq. 1; *Sullivan v. Jones, Co.*, 208 Pa. St. 540 (1903); *Hunt v. Steese*, 75 Cal. 620; *Owen v. Brien,* 2 Tenn. Ch. 295; *New Jersey Co. v. Trotter*, 38 N. J. Eq. 3; *Reed v. Jones*, 6 Wis. 655; *Lucas v. Milliken*, 139 Fed. 816; *Dady v. Ga. & A. Ry. Co.*, 112 Fed. 838; *McHenry v. Jewett*, 90 N. Y. 58; *Commissioners v. P. & C. R. R.*, 24 Pa. St. 159; *Field v. Barling*, 149 Ill. 556; *Wahle v. Reinbach,* 76 Ill. 322; *Newell v. Sass*, 142 Ill. 104.

## BRIEF FOR DEFENDANTS.

Messrs. *Winston, Payne, Strawn & Shaw, John J. Herrick, A. S. Lovett* and *Sullivan & Cromwell* and *John M. Dickinson*, attorneys for defendants.

## I.

The Railroad Securities Company is the owner by a valid title, of the stock held by it, and can, therefore, lawfully vote it.

(a) Under the law of comity the Railroad Securities Company, having the power by its charter, could lawfully purchase and hold stock in an Illinois corporation, as authorized by its charter and having acquired it, exercise the right incident to its ownership, that of voting the stock in Illinois, unless its purchase and holding of the stock was either prohib-

ited by some express statutory provision, or was contrary to
the public policy of the state, as manifested in some affirma-
tive way, either by the express adjudications of the highest
court of the state, or the course of its legislation. Morawetz
on Corporations, sec. 960–962, 966; *Cowell v. Springs Co.,*
100 U. S. 55; *Christian Union v. Yount,* 101 U. S. 352; *Ste-
vens v. Pratt,* 101 Ill. 206; *Female Academy v. Sullivan,* 116
Ill. 375; *People v. Fidelity & Casualty Co.,* 153 Ill. 25; *United
States Mortgage Co. v. Gross,* 93 Ill. 483.

1. There are no adjudications of the supreme court of
Illinois that it is contrary to the law or public policy of Illi-
nois for a corporation of another state, having power by its
charter so to do, to own and hold stock in another corpora-
tion in Illinois, and exercise the right incident to its owner-
ship—that of voting the stock. *People ex rel. v. Chicago Gas
Trust Co.,* 130 Ill. 268; *People ex rel. v. Pullman's Palace
Car Co.,* 175 Ill. 125; *Dunbar v. American Tel. Co.,* 224 Ill. 9.

2. There is no legislation in Illinois which affirmatively
shows that it is against the public policy of the state for the
Railroad Securities Company to own and vote the stock held
by it, as authorized by its charter and the rule of comity.
Sec. 26, General Incorporation Act of Illinois; *Stevens v.
Pratt,* 101 Ill. 206, 216, 219; *Wincock v. Turpin,* 96 Ill. 135,
144; *Mead v. Davies,* 84 Ill. App. 558; *Union Mutual Insur-
ance Co. v. Trear Stone Mfg. Co.,* 97 Ill. 537; *Western Mfg.
M. Ins. Co. v. Hutchinson Cooperage Co.,* 92 Ill. App. 16;
*Ross v. Knapp, Stout & Co.,* 77 Ill. 424, 426.

3. If it be assumed as contended for complainants, that the
statutes of Illinois do not authorize the organization in Illi-
nois of corporations to do the business which the Securities
Company was organized to do, this does not manifest a public
policy of the state against such corporations purchasing and
holding stock in an Illinois Corporation, and exercising in
Illinois the right incident to its ownership—that of voting
the stock. That there is, in fact, no such policy, is affirma-
tively shown by different acts of the legislature expressly
authorizing different corporations to invest their funds in the

purchase of stock of other corporations. *Stevens v. Pratt,* 101 Ill. 206, 225, 227; *People v. Fidelity Insurance Co.,* 153 Ill. 25; *United States Mortgage Co. v. Gross,* 93 Ill. 483; Act of 1883, Hurd's Revised Statutes 1906, pp. 1170, 1180; Act of 1869, Hurd's Stat. 1906, pp. 1205, 1206; Act of 1887, Hurd's Stat. 1906, p. 540; Act of 1897, Hurd's Stat. 1906, p. 542.

4. The exercise by the Securities Company of its power, under its charter, to own and vote the stock held by it in the Illinois Central Company, is not contrary to the public policy of Illinois, as manifested by its legislation, but is in accordance therewith, for the reason that the organization of corporations, having the same object and the same powers when organized as the Railroad Securities Company is authorized by the General Incorporation Act of Illinois. General Incorporation Act of Illinois, secs. 1, 5; *People v. Pullman Car Co.,* 175 Ill. 159; *Pearson v. Railroad,* 62 N. H. 537, 548, 549. The right to vote stock is an ordinary incident of its ownership the same as the right to collect dividends. *Davis v. U. S. Electric Power & Light Co.,* 77 Md. 35, 39; *Taylor & Co. v. Southern Pac. Co.,* 122 Fed. 147, 151, 152; *Lucas v. Milliken,* 139 Fed. 816, 835, 836; *Camden & U. R. R. Co. v. Elkins,* 37 N. J. Eq. 273, 276. The purpose for which the Railroad Securities Company was organized, as evidenced by its charter ("to purchase, receive, hold and own" bonds, shares of capital stock, etc., of different kinds of corporations specified, etc., etc.), and the acts which it has done under it, is a lawful purpose. *Oregon Ry. Co. v. Oregonian Ry. Co.,* 130 U. S. 1; *Harding v. Glucose Co.,* 182 Ill. 551; *United States Vinegar Co. v. Schlegel,* 67 Hun, 356, 360; *State v. Corkins,* 123 Mo. 56; *People v. Chicago Gas Trust Co.,* 130 Ill. 268, 283, 287, 290, 291, 292, 293; *Dunbar v. American Telephone Co.,* 224 Ill. 9; 1 Cook on Corporations, secs. 310, 317, pp. 691, 696, 697; *Market St. Ry. Co. v. Hellman,* 109 Cal. 571, 589; *National Bank v. Texas Investment Co.,* 74 Tex. 421; *State v. Minnesota Thresher Mfg. Co.,* 40 Minn. 213, 223; *Vokes v. Eaton,* 119 Ky. 913; *State v. Corkins,* 123 Me. 56; *York Park Bldg. Asso. v. Barnes,* 39 Neb. 834, 838; *Enterprise Brg. Co.*

v. *Grime,* 173 Mass. 252; *Brown v. Corbin,* 40 Minn. 508; *Cahall v. Citizens' Mutual Bldg. Asso.,* 61 Ala. 232; *Killingsworth v. Portland Trust Co.,* 18 Oregon, 351.

5. The entire transaction of the purchase by the Railroad Securities Company of its stock in the Illinois Central Railroad Company, including the transfer and registration of the stock in its name, was done outside of Illinois, and, for that reason, did not involve the exercise by the Securities Company of any corporate power in Illinois; and it being indisputable that there is no public policy of Illinois against a foreign corporation, which owns stock in an Illinois corporation, exercising the power of voting the stock, which is incident to the ownership it follows that the Railroad Securities Company can lawfully vote the stock. Charter Illinois Central Railroad, 1851; *Merritt v. American Steel Bridge Co.,* 79 Fed. 228; *State v. Newman,* 51 La. Ann. 833, 837, 838.

6. The fact that the Union Pacific Company acquired from the individuals who owned it, a controlling interest in the stock of the Securities Company in October, 1906, is immaterial to the question under consideration—whether the Securities Company acquired a valid title to the stock in the Illinois Central Company it purchased in 1901, and can lawfully exercise the right incident to its ownership—that of voting the stock. *Hopkins v. Roseclare Lead Co.,* 72 Ill. 373, 379; *Sellers v. Greer,* 172 Ill. 549, 556; *England v. Dearborn,* 141 Mass. 590; *Button v. Hoffman,* 61 Wis. 20; *Peterson v. C. R. I. & P. Ry.,* 205 U. S. 364, 391, 392; *Pullman's Palace Car Co. v. Missouri Pac. Co.,* 115 U. S. 587, 597; *Farmers' Loan & Trust Co. v. C. P. & S. Ry.,* 39 Fed. 143; *C. Kase v. Michigan Telephone Co.,* 121 Mich. 631; *A. T. & S. F. R. Co. v. Cochran,* 43 Kan. 225, 233, 235; *Lange v. Burke,* 69 Ark. 85, 89.

7. The foreign corporation Act of 1905 has no application to the only act which the Railroad Securities Company has done since it acquired the stock in 1901, or to the only act which it intends to do—the act of voting the stock at stockholders' meetings. *Illinois Foreign Corporation Act of 1905.* Under the facts, the only act which the Securities Company

has threatened or intends to do, the voting of the stock, is not within the terms and intention of the Act. 3 Clark & Marshall on Corporations, sec. 826, p. 2710; 13 Am. & Eng. Enc. Law (2d ed.) 872; *Cooper Mfg. Co. v. Ferguson,* 113 U. S. 727, 734; *Peterson v. C. R. I. & P. Ry.,* 205 U. S. 364, 392, 394; *Penn. Collieries Co. v. McKeener,* 183 N. Y. 98; *D. & H. Canal Co. v. Mahlenbrock,* 63 N. J. L. 281, 287; *Kephart v. People,* 28 Colo. 73, 76. The Act was intended to be prospective only. *Richardson v. U. S. Mortgage Co.,* 194 Ill. 259; *Chicago Title & Trust Co. v. Bashford,* 120 Wis.' 281; *Keystone Mfg. Co. v. Howe,* 89 Minn. 256; *Pioneer, etc., Loan Co. v. Cannon,* 96 Tenn. 599. If by any construction of the Act, the voting of the stock could be brought within the intention of the statute, it would impair the obligation of the contract, and deprive the defendant company of a property right incident to its ownership of the stock—the right to vote it—without due process of law. *State v. Greer,* 78 Mo. 188; *Taylor v. Southern Pacific Co.,* 122 Fed. 147, 151, 152; *Richardson v. U. S. Mortgage Co.,* 194 Ill. 259.

## II.

The complainants are barred by their laches and acquiescence from obtaining the equitable relief of an injunction against the voting of the stock held by the Railroad Securities Company. *Simmons v. B. C. R. & N. R. Co.,* 159 U. S. 228, 291; *St. L. & T. H. R. Co. v. T. H. & I. R. Co.,* 145 U. S 393.

(a) Stockholders are barred by laches and acquiescence from obtaining affirmative relief as to a contract or transfer of title by or to a corporation on the ground that it was *ultra vires. Dimpfell v. O. & M. Ry. Co.,* 110 U. S. 209; *Kent v. Quicksilver Mining Co.,* 78 N. Y. 159; *Alexander v. Searcy,* 81 Ga. 526; *Campbell v. Railroad,* 111 Tenn. 55; *Terry v. Eagle Lock Co.,* 47 Conn. 141; *Rabe v. Dunlap,* 51 N. J. Eq. 40; *Taylor v. S. & N. A. R. Co.,* 13 Fed. 152; *Boyce v. Montauk Gas Coal Co.,* 37 W. Va. 73; *Levin v. Chicago Gas Light & C. Co.,* 64 Ill. App. 393; *Higgins v. Lansingh,* 184 Ill. 301, 391.

(b) A stockholder is barred by laches and acquiescence from obtaining relief on the ground that the transaction was unlawful for other reasons. *Coquard v. Nat'l Linseed Oil Co.,* 171 Ill. 480; *Perry Co. v. Stebbins,* 66 Ill. App. 427; *Stewart v. E. & W. Transp. Co.,* 17 Minn. 372, 399, 400.

(c) Where the complainant has means of knowledge of which he fails to avail himself this may amount to laches that will prevent relief. *Coquard v. Nat'l Linseed Oil Co.,* 171 Ill. 480; *Jesup v. I. C. R. R. Co.,* 43 Fed. 483; *Leavenworth Co. v. C. R. I. & P. Ry.,* 18 Fed. 209; *Kimbell v. Chicago Hydraulic Press B. Co.,* 119 Fed. 102; *Boyce v. Coal Co.,* 37 W. Va. 73, 88, 89; *Kent v. Quicksilver Mining Co.,* 78 N. Y. 159.

(d) Participation and acquiescence by proxy is as effectual as personal acquiescence. *Zabinskie v. C. C. & C. R. Co.,* 23 How. 381, 400.

(e) Stock purchased in anticipation of instituting suit is open to suspicion. *Dimpfell v. O. & M. R. Co.,* 110 U. S. 209, 210.

(f) A purchaser of shares of stock acquires no greater rights than the prior holder, and if his predecessor in title has acquiesced in the transaction complained of he is also bound by such acquiescence. Morawetz on Corporations, sec. 267; *Campbell v. Railroad,* 111 Tenn. 553; *Trimble v. American Sugar Refining Co.,* 61 N. J. Eq. 340; *Hyde Park Gas Co. v. Kerber,* 5 Ill. App. 132.

## III.

The Union Pacific Company is the owner by a valid title of the stock held by it, and can, therefore, lawfully vote it. Act of Utah, 1901 (ch. 26, sec. 5):

(1) There is no course of legislation in Illinois which manifests affirmatively a public policy of the state against the purchase and holding by a foreign railroad company, in the exercise of the power granted by its charter, of stock in an Illinois corporation owning a connecting road, and the exercise by it for a lawful purpose of right incident to its ownership—that of voting the stock. Illinois Foreign Corporation

Act of 1905; sec. 26, General Incorporation Act of Illinois; sec. 14, General Railroad Act of Illinois.

(2) So far from the adjudications of the courts of Illinois, or its course of legislation, manifesting a public policy against one railroad company acquiring the interest in another railroad company evidenced by the purchases of its stock, where the lines of the two companies are connecting, the legislation of the state shows affirmatively a well settled policy to authorize and promote the union of ownership and interest of connecting lines by every form of ownership or interest— operating contracts, purchase, lease, consolidation, purchase of stock, etc. Act of 1855 to enable railroads to enter into operative contracts, Rev. Stats. 1906, p. 1573; *Illinois Midland Ry. Co. v. People,* 84 Ill. 426; *Penn. Co. v. St. L. A. & C. R. Co,* 118 U. S. 290, 309; Act of 1875, Rev. Stats. 1906, p. 1573; Act of 1885, Rev. Stat. 1906, p. 1606; secs. 1, 8, Consolidation Act, Rev. Stats. 1906, p. 507; Act of 1891, sec. 14, Rev. Stat. 1905, p. 1567; Act of 1899, Rev. Stats. 1906, p. 1611.

(3) Even if, as is contended, the legislature of Illinois has not deemed it best to vest such power in its own railroad corporations, this is not such affirmative evidence of a public policy of the state against foreign railroad corporations purchasing and owning stock in other corporations, when authorized by their charters to do so, as will render the purchase and ownership of the stocks thus acquired unlawful, under the rule of comity.

(4) The Illinois Statute of 1899 recognizes, and is, in legal effect, a legislative declaration that it is not contrary to the public policy of Illinois for a foreign railroad company, which has the power by its charter so to do, to purchase and hold stock in a railroad corporation of this state owning a connecting line. Rev. Stat. 1906, p. 1611, as to foreign corporations holding stock in Illinois railroad corporations; *Christian Union v. Yount,* 101 U. S. 352; *Stevens v. Pratt,* 101 Ill. 206.

(5) The entire transaction of the purchase by the Union Pacific Company of its stock in the Illinois Central Com-

pany, including the transfer, was done outside of Illinois, and, for that reason, did not involve the exercise by the Union Pacific Company of any corporate power in Illinois; and, it being indisputable that there is no public policy of Illinois against a foreign corporation, which owns stock in an Illinois corporation, exercising the power of voting the stock, which is incident·to the ownership, it follows that the Union Pacific Company can lawfully vote the stock.

## IV.

The transactions of the purchase and sale of the stock held by the Railroad Securities Company and the Union Pacific Company are executed transactions, and the validity of their title to it cannot now be questioned by the complainants.

(1) The validity of the sales and transfers of the stock to the defendant companies, which were completely executed long before the filing of the bill, cannot be questioned by any of the parties to the transactions of sale and transfer or anyone claiming under them (much less by third persons not parties to the transfer) on the ground that it was *ultra vires* the corporation. In such case only the state can raise the question. Clark & Marshall on Corporations, vol. 1, p. 553; *C. H. & D. R. Co. v. McKeen*, 64 Fed. 36; *Dewey v. Toledo, Ann Arbor & N. M. R. Co.*, 91 Mich. 351; *Long v. Georgia Pacific Ry. Co.*, 91 Ala. 519; *Baker v. Northwestern Guaranty Loan Co.*, 36 Minn. 185; 29 Am. & Eng. Enc. Law (2d ed.) 80; Clark & Marshall on Corporations, 609, 611; *Railroad Co. v. Ellerman*, 105 U. S. 166, 173, 174; *Parish v. Wheeler*, 22 N. Y. 494, 503, 508; *John V. Farwell Co. v. Wolf*, 96 Wis. 10, 13, 16; *Peru Plow & Implement Co. v. Harker*, 144 Fed. 673, 674; *Bigbee & Warrior River Packet Co. v. Moore*, 121 Ala. 379, 382; *Belcher Sugar Refining Co. v. St. Louis Grain Elevator Co.*, 101 Mo. 192, 208; *State Insurance Co. v. Farmers' Mutual Insurance Co.*, 65 Neb. 34, 41; *Smith v. First Nat'l. Bank*, 45 Neb. 444, 449; *D. & J. D. Edwards v. Fairbanks*, 27 La. Ann. 449, 450; *Rafferty v. Central Traction Co.*, 147 Pa. St. 579; *Beels v. Fair Asso.*, 54 Neb. 226; *Taylor v. Calloway*, 27 S. W. 934; *Collins v. Rea*, 127 Mich. 273.

(2) If, as we have shown, the title which the two companies acquired, to the stock cannot be questioned by the complainants, on the ground that the purchase was *ultra vires* the corporation by reason of the fact that the transactions were executed, and also because they are third parties to the transaction, it follows that, for the same reason, they cannot question the power of the two companies to exercise the rights which are the incidents of, and belong to the ownership of, the stock, including the right to vote it.

(a) The right to vote stock is incident to its ownership. *Rogers v. N. C. & St. L.,* 91 Fed. (C. C. A.) 312; *Oelberman v. N. Y. C. Co.,* 29 N. Y. S. 545; *Davis v. U. S. Electric Power & Light Co.,* 77 Md. 35, at 39; *Taylor v. Southern Pacific Co.,* 122 Fed. 147, at 151, 152; *Lucas v. Milliken,* 139 Fed. 816. See *State v. Newman,* 51 La. Ann. 833, 837.

## V.

Under the facts shown by the evidence and under the well settled law governing the subject, the complainants have not made such a case as entitles them to a preliminary injunction enjoining the voting of the stock. 2 Cook on Corporations, sec. 616 (p. 1327); *Lucas v. Milliken,* 139 Fed. 816, 833, 836; *Reed v. Jones,* 6 Wis. 680, 692; *Dady v. Ga. & A. Ry.,* 112 Fed. 838, 845; *McHenry v. Jewett,* 90 N. Y. 58, 62; High on Injunctions, sec. 5a; *American Refining Co. v. Linn,* 93 Ala. 610; *Blatchford v. Chicago D. & D. C.,* 22 Ill. App. 370; *Fritz v. Erie City Passenger Ry.,* 155 Pa. St. 472; *Smith v. Reading City Pass. Ry.,* 156 Pa. St. 5; *Citizens' Coach Co. v. Camden Horse R. R. Co.,* 29 N. J. Eq. 299; *Ocean City Asso. v. Schurch,* 57 N. J. Eq. 268; *Newark Aqueduct Board v. Passaic,* 46 N. J. Eq. 552; *Wait v. Chichester Chair Co.,* 45 Fed. 258.

### OPINION.

BALL, J.:—

This case comes before the court on a motion to dissolve the temporary injunction.

It is urged that complainants, under the rules of equity practice should have requested the officers and directors of the Illinois Central to bring this suit—that such a request and a refusal by the corporation are necessary prerequisites to their right to begin this action.

This suit might have been brought by the Illinois Central. Its subject matter is one in which all the stockholders of that corporation are equally interested. The bill is framed on that theory. It states that complainants bring this' action "in their own behalf, and in behalf of all stockholders of the Illinois Central Railroad Company similarly situated who may unite with them and become parties complainant to this bill of complaint."

Before a stockholder is entitled in his own name to institute and conduct a litigation which usually belongs to the corporation he should show to the satisfaction of the court that he called upon the directors to bring the suit and their neglect or refusal to comply with his request; or he must show that an application to them would have been futile, and therefore useless. Where the stockholder brings such an action the bill should contain an account of such demand and refusal, or should state facts and circumstances showing that such demand would have been an idle ceremony. *Chicago v. Cameron*, 120 Ill. 447, 457; *Bruschke v. Der Nord Chicago Schuetzen Verein*, 145 Ill. 433, 445; *Green v. Hedenberg*, 159 Ill. 489; *Stebbins v. Perry County*, 167 Ill. 567; *Harding v. American Glucose Co.*, 182 Ill. 551, 629; *Hawes v. Oakland*, 104 U. S. 450, 460; *Rogers v. Nashville C. & St. L. Ry. Co.*, 91 Fed. Rep. 299, 306.

The bill as amended alleges that complainants made no application to the company to bring this suit first, because they believe they have the individual right as stockholders to bring this action; and, second, that it would have been an idle ceremony to have made such application, because eight of the thirteen directors of the Illinois Central believe that the Union Pacific and the Securities Company have the right to hold and to vote the stock severally owned by them; because

three of these directors have participated in the unlawful acts complained of, and five others of them would have been advised by Harriman not to allow the bringing of such a suit and would have followed such advice; and because of the personal hostility of eight of said directors to Fish they would not have permitted such suit to be brought.

Passing the first reason given, as it is a legal conclusion, the alleged facts stated as the basis of the second reason are vigorously denied in the affidavits filed by said eight directors. They say that the right of the Union Pacific and of the Securities Company to hold and to vote the stocks held by them severally never came up nor was it ever considered by them prior to the bringing of this suit, that they are not dominated by Harriman, that he never advised with them in this regard, and if he did, each of them would have followed his individual and independent judgment in passing upon the question; and that the personal hostility charged, if any they have toward Fish, has arisen since this suit was commenced, and was brought about by the acts and statements of Fish herein.

The history of the Illinois Central for the last eighteen months clearly shows that a dispute between Fish and his friends on the one side, and Harriman and his friends on the other, has been on. In 1906 each party scored a victory. The Fish faction defeated DeForest as a director; and the Harriman faction elected Harahan as president in place of Fish. As the annual election of 1907 approached it is apparent each faction exerted itself to obtain proxies favorable to its plans. The hostility between these parties was open and aggressive. In this condition of affairs it is not reasonable to presume, if application had been made to the directors (a majority of whom are frankly opposed to Fish and to his plans) to begin this suit, which if successful would deprive them of half their voting strength, that such request would have been granted. I am therefore of the opinion that, in this particular, complainants have shown their right to begin and to carry on this action. *Rogers v. Nashville, C.*

& St. L. Ry. Co., 91 Fed. Rep. 299, 306; Mack v. De Bardele-
ben Coal & Iron Co., 90 Ala. 396, 8 So. 150.

The only thing averred and proved in this case as to the
future actions of the defendants is that at the coming elec-
tion the Union Pacific and the Securities Company will vote
the stock they severally own and control for the re-election
of three of the present directors, each of whom has served
the Illinois Central acceptably for many years, and for a
fourth director, in place of Mr. Fish, a competent man who
is not in any way connected with the Union Pacific. No act
prejudicial to the Illinois Central, or to its stockholders, is
shown to have been done, unless the mere fact that the Union
Pacific and the Securities Company own 29 per cent. of the
stock of the Illinois Central be considered to be so. No
change in the purpose or conduct of the Illinois Central is
averred. The history of the company shows that since the
retirement of Mr. Fish from the presidency the policy of the
company has been the same, and its executive officers, with
one exception caused by death, have remained the same from
that day to this. The relations between the Union Pacific
and the Illinois Central are now what they were when Mr.
Fish was in power and assisted in shaping and consented
to such relations. Nor is any change intended, if the affi-
davits of well known and reputable men be considered as
true. The bill, however, charges many things which may
happen to the detriment of the Illinois Central and to its
stockholders if the Union Pacific and the Securities Com-
pany be permitted to vote at such meeting; but no facts are
alleged or proved which even tend to bring about such re-
sults. Courts of equity act on facts alleged and proved, and
not on fears, nor even on supposed prophesies. If it were
not for the fact that the name of Harriman is a name to con-
jure with these allegations would not be taken so seriously.
There are many things stated in the bill as to the intention
of the defendants, which, if put in force, or even attempted
to be put in force, would call upon the court to intervene;
but a diligent search of this record fails to show that such

things exist in any concrete form. To put their contention into a few words: complainants say that if the Union Pacific and the Securities Company are permitted to vote at the coming election, the hold of Mr. Harriman upon and his domination over the Illinois Central will be strengthened, and that finally the Illinois Central will be reduced to a servient position and will be given the lean end of the carrying trade. But they fail to allege and prove facts supporting these allegations. The rule is that unless the statements of the bill are sustained by pleaded and proved facts they become the mere conclusions of the pleader, which need not be controverted by the defendants, and which will not be enforced by the decree of the court. This rule is strictly enforced where fraud or bad faith is charged. *Sterling Gas Co. v. Higby,* 134 Ill. 557; *Chicago v. People,* 210 Ill. 84. In every case cited by complainants to support the bill in this regard some act was alleged and proved which directly tended to produce, or directly produced, the unlawful purpose or inflicted the injury the bill was filed to remedy or to prevent.

It is to be presumed, until the contrary affirmatively appears, that any man elected as a director of a corporation will do his duty; that he will not knowingly act, either singly or in concert with his fellow directors, so as to impair the usefulness of his corporation, or to squander its property; nor to turn it over, bound hand and foot, to the control of another corporation. *Mack v. De Bardeleben Coal & Iron Co.,* 90 Ala. 396, 8 So. 150; *Boyd v. Sims,* 87 Tenn. 771, 11 S. W. 948.

While Mr. Fish may rightfully and honorably desire to remain a director of the Illinois Central, and to accomplish that end may use every lawful means in the power of himself and of his friends, he has no right to that office until he is elected thereto by a majority of the votes cast by the shareholders entitled to vote at a valid meeting called for that purpose. Hence, his defeat, if it comes from the lack of valid votes, is no legal injury to the civil or property right of Fish or those of his fellow complainants.

As private citizens the complainants are not the keepers of the public conscience, nor are they the conservators of the rights of the public. To sustain this bill it is not sufficient for them to show merely that the act complained of is a public wrong; they must also show that by the doing of such act they will suffer a special injury to their civil or to their property rights. *North American Insurance Co. v. Yates,* 214 Ill. 272, 283. This election of directors at the coming meeting can work no legal wrong to complainants, and no impending special injury to them or to any or to either of them is proved which calls for the interposition of this court. It is the clear right of a majority of the stockholders of a corporation to elect a board of directors that will carry out its wishes. *Lucas v. Milliken,* 139 Fed. 816.

One who owns stock in a corporation has a right to vote such stock at any and every lawful meeting of the stockholders of the corporation. This right to vote is an integral and necessary part of ownership, and is as vital as is the right to receive the dividends lawfully declared upon such stocks. *Rogers v. Nashville C. & St. L. Ry. Co.,* 91 Fed. 299, 312; *Taylor v. Southern Pacific Co.,* 122 Fed. 147, 151; *Lucas v. Milliken,* 139 Fed. 816; *Davis v. United States Electric Power & Light Co.,* 77 Md. 35, 25 Atl. 982.

I do not understand that at common law, when the ownership of stock in a corporation has been legally acquired, such ownership is a qualified one. If it is thus owned, whether by an individual or by a corporation, none of the rights attending ownership lie dormant or are incapable of being exercised.

The findings and opinion of the Interstate Commerce Commission are not evidence in this case. The act itself provides that such findings shall be *prima facie* evidence in civil cases only brought in the United States circuit court to enforce the commissioners' award of damages. Railway Rate Act of June 29, 1906.

"The commission is charged with the duty of investigating and reporting upon complaints, and the facts found or reported by it are only given the force and weight of *prima.*

*facie* evidence in all such judicial proceedings as may there-
after be required or had for the enforcement of its recommen-
dation or order.    *    *    *    It is neither a federal court un-
der the constitution, nor does it exercise judicial powers, nor
do its conclusions possess the efficacy of judicial proceed-
ings." *Kentucky & I. Bridge Co. v. Louisville & N. R. Co.,*
37 Fed. 567, 613.

This court has no power to enforce the Sherman Act. That
act limits all equitable remedies to suits brought in the fed-
eral courts by the district attorney under the authorization
of the Attorney General of the United States. *South. In-
diana Exp. Co. v. United States Exp. Co.,* 92 Fed. 1022;
*Minnesota v. Northern Securities Co.,* 194 U. S. 48.

There is but one ground upon which this bill can be main-
tained. If the Union Pacific had no right to buy, hold or
own stock in the Illinois Central, or the Securities Company
stands in the same category, and both are or either of them is
intruding in this election wholly without right, then I think
any *bona fide* stockholders, without alleging irreparable in-
jury, may ask the court to throw them or it out. To hold
otherwise would be to permit an intruder to interfere in the
conduct and control of the corporation against the wishes
of its lawful owners, on the ground that what such intruder
was attempting to do was not an irreparable injury to such
*bona fide* owners. *Stebbins v. Perry Co.,* 167 Ill. 567; *Dun-
bar v. American Telephone & Telegraph Co.,* 224 Ill. 9, 26;
*State v. Port Royal & A. Ry. Co.,* 45 S. C. 470, 23 S. E. 383.

This brings us to the question, is there in the public policy
of this state a prohibition against the voting by a foreign
corporation of stock in a domestic corporation, which stock,
it purchased and paid for and owns and holds under an ex-
press power granted to it by the state of its creation?

The mere fact that the Securities Company and the Union
Pacific are corporations does not debar them from buying
and holding the stock of other corporations or from enjoying
all the rights and privileges which accompany such owner-
ship. Several classes of corporations, presumably having

funds to invest, are authorized by the statutes of this state and by the laws of almost all of the other states of the union, to invest such funds in the stocks of other corporations. Other things being equal, it is for the benefit of any domestic corporation, having stock for sale and depending upon such sales for the money necessary to carry on the objects for which it is created, not only to have a world wide market in which to effect its sales, but also to have as few as possible of would-be purchasers disabled from buying.

Nor does the mere fact that such investing corporations are foreign corporations and the purchase made is of stock in a domestic corporation change the rule of law; for by the statutes of this state many classes of foreign corporations are expressly empowered to buy stock in domestic corporations.

The reason why purchases of the stock of the Illinois Central by the Securities Company and by the Union Pacific are invalid, if they are invalid, must be found elsewhere than in the fact that they are foreign corporations.

It must be conceded that one corporation may by the state of its creation be given the power to lay out, construct and operate a railroad; to another the power to accept trusts; to another the power of insurance; and to each of these may be added the power to buy, hold and sell the stock of other corporations. When two distinct powers are thus granted, the existence of one of the powers does not depend on the existence, or on the exercise of the other power. One power only may be expressly given to a corporation; and in nearly all, if not all of the states of the union, that single express power may be that of buying, owning and holding the stock of other corporations. Railroads as well as investment companies, or insurance companies, or trust companies, may have funds which they desire to invest, for a longer or shorter time, in the stocks of other corporations. Whether it is wise for them to do so, the power being granted, is a question for the officers and directors of the investing company, and for no one else to decide. For a railroad company thus to invest its

funds is not *malum in se,* and in the absence of an express statutory prohibition, or public policy to the contrary in the local jurisdiction of the corporation in whose stock it thus invests, it is not *malum prohibitum.* There is nothing peculiar to a railroad corporation that differentiates it from other corporations so far as any question of comity, or danger, or prejudice to the interests of the people or the public interests is involved. *Thompson v. Waters,* 25 Mich. 214, 234.

I do not understand that there is any general rule of the American common law that one corporation cannot own stock in another corporation. The rule referred to by complainants' counsel is that a corporation cannot become a stockholder in another corporation unless power to do so is specifically granted in its charter or is necessarily implied in it. (*People v. Pullman's Palace Car Co.,* 175 Ill. 125, 159.) And this latter rule is one of construction only, and based upon the ground that such a transaction is generally foreign to the objects of its creation, and is a departure from its charter purposes, and not upon any notion that the nature of a corporation renders it incapable of taking and holding stock in other corporations. A corporation, therefore, may take and hold stock in another corporation whenever it is expressly authorized to do so. (1 Clark & Marshall on Corporations, 527.) In this case it is proved, and not controverted, that the Union Pacific and the Securities Company each has express power granted to it by the state of its creation to buy, own and hold stock in other corporations.

The law of comity among the states is that rule "which in the absence of positive direction to the contrary, obtained through the states and territories of the United States, by which corporations created in one state or territory are permitted to carry on any lawful business in another state or territory and to acquire, hold and transfer property there equally as individuals. If the policy of the state or territory does not permit the business of the foreign corporation in its limits, or allow the corporation to acquire or hold real property, it must be expressed in some affirmative way; it cannot

be inferred from the fact that its legislature has made no provision for the formation of similar corporations, or allows corporations to be formed only by general law.''—*Stevens v. Pratt,* 101 Ill.. 206, 225. See also: *Santa Clara Female Academy v. Sullivan,* 116 Ill. 375; *People v. Fidelity & Casualty Co.,* 153 Ill. 25; *Cowell v. Springs Co.,* 100 U. S. 55; *Christian Union v. Young,* 101 U. S. 352.

The public policy of a state is to be found in the statutes, and when they have not directly spoken, then in the decisions of the courts and in the constant practice of government officials. When the legislature speaks upon a subject upon which it has the constitutional power to legislate, public policy is what the statute passed by it indicates. (*Harding v. American Glucose Co.,* 182 Ill. 551, 616. Cited with approval in *North American Insurance Co. v. Yates,* 214 Ill. 272, 277.) Public policy is that which the state adopts by statute, unless such statute is contrary to the constitution of the state or the United States. (*Whitfield v. Aetna Life Insurance Co.,* 205 U. S. 489, 495.)

There is in the law of this state no discrimination against foreign corporations, but they are given a hospitable reception and are placed upon an equal footing with our domestic corporations. (*Santa Clara Female Academy v. Sullivan,* 116 Ill. 375, 383.)

Four cases decided by the supreme court of Illinois are cited as having some bearing on the question whether or not it is against the public policy of the state to permit a foreign corporation, having the power by its charter to buy, own and hold stock in another corporation, to buy, own and hold stock in a domestic corporation.

*The People v. Chicago Gas Trust Co.,* 130 Ill. 268, was a *quo warranto.* It appeared that the Gas Trust was a domestic corporation. By its charter it had power to manufacture and to sell gas. In the articles filed with the secretary of state it named as one of the objects of its incorporation the power to purchase and hold the capital stock of similar corporations. It appeared that the Gas Trust Company had not

manufactured and sold gas, but it had purchased a majority of all the stock of each of the four separate and independent gas companies located and doing business in the city of Chicago. It was held that the control of these four companies suppressed competition between them, and destroyed their diversity of interest and all motive for competition, and thus built up a virtual monopoly. It was further held that the corporation was not formed for a lawful purpose, and all acts done by it to accomplish such object were null and void, and that where corporations are formed under the general law, the law, and not the statement or license or certificate, determines what powers are granted.

In *The People v. Pullman's Palace Car Co.*, 175 Ill. 125, the Pullman company was chartered by this state to purchase, build and run railway cars. After its organization, as time went on, it became possessed of a city office building, a multiform factory for the construction of cars, and lands and sidings for the storage of cars. It also purchased additional lands and built thereon a town of dwellings, shops and public buildings for the use and benefit of its workmen; and it purchased and held the stock of another corporation the Pullman Iron & Steel Company, which it alleged, though nominally independent, was really a part of its own plant. Upon these facts the attorney general brought a writ of *quo warranto* against the Pullman Company. The supreme court decided that under its charter the company could own and hold such real estate as was necessary for the convenient transaction of its business; and therefore the owning and holding of the city office building, the factory, and the lands for siding and storage of cars were within its powers; but that the building up and running of the town of Pullman was *ultra vires,* and therefore it was directed to sell the same. It was also held that under its charter the company had neither the express power, nor the implied power, to purchase the stock of another corporation, and therefore it had no right or power to buy or own the stock of the Pullman Iron & Steel Company.

In *McCoy v. Worlds Columbian Exposition,* 186 Ill. 356,

McCoy subscribed for 1,000 shares of the capital stock of the appellee company. When sued for the amount of calls made on the stock, the trial court directed a verdict against him. On appeal he attacked this direction upon the ground that the stock had not been fully subscribed at the time the calls were made. It appeared that all the stock had been subscribed for, but part of those subscriptions had been made by domestic corporations and by national banks; and he argued that as these subscriptions were *ultra vires* the several corporations, they were not binding. Upon this contention the court says: "Corporations organized under the laws of this state cannot become stockholders in other corporations unless power is specifically given by their charters or necessarily implied from them (*People v. Chicago Gas Trust Co.,* 130 Ill. 268), and national banks have no power to subscribe for capital stock of other corporations." The court then go on to say that such corporations might make that defense or not as they pleased; but there was no proof that they had done so, and that appellant could not make this defense for them. The judgment against him was affirmed.

In *Dunbar v. American Telephone & Telegraph Co.,* 224 Ill. 9, a bill was brought by minority stockholders to annul the purchase by the defendant company, a foreign corporation, of a majority of the stock of the Kellogg Company, an Illinois corporation. The court found as fact that the "American Company, through defendant Barton and others, became the purchaser of the shares of stock, with the unlawful purpose and intention of putting the Kellogg Company out of business or so using and controlling it as to prevent rivalry in business and creating a monopoly," (p. 22) and then found, as law, that such conduct on the part of the American Company was fraudulent as against the stockholders of the Kellogg Company, and against which, on the plainest principles of equity, a stockholder in the Kellogg Company should have the right to relief. (p. 29.)

It will be seen that no one of these cases touches the question as to whether or not it is against the public policy of

this state for a foreign corporation to purchase, hold and vote stock, which it had the express right by its charter to acquire, in a domestic corporation.

What is the public policy of the state of Illinois upon the question, as shown by its statutes?

For forty years last past the statutes of the state have recognized the right of foreign corporations, other than railroads, to invest their funds or any part thereof in the stock of domestic corporations.

By dismissing the Mutual Insurance Company of New York, holding 5,500 shares of Illinois Central stock, out of this case the complainants impliedly admit that this is the law as applied to life insurance companies.

The Act of 1869 permits domestic fire, marine and inland navigation insurance companies to invest their funds in "the stocks, bonds or other evidences of indebtedness of any solvent, dividend paying institution incorporated under the laws of this state or of the United States, except their own stock:" (Hurd's Illinois Statutes, 1905, sec. 54, p. 1175.)

The same act provides that a foreign insurance company on coming into this state must make a statement of "the number of shares of stock of every kind owned by it, the par and market value of the same." (Hurd's Illinois Statutes, 1905, sec. 40, p. 1170).

Section 186 of chapter 73 (1869) declares that every life insurance company must include in its annual statement the "Number of shares owned in any railroad, stating the corporate name of each and the amount invested in each, at cost, on its books;" (Hurd's Illinois Statutes, 1905, p. 1205).

In section 191 of the same chapter it is said: "It shall be lawful for any (life insurance) company organized in this state, to invest its funds or accumulations in the stocks of the United States, or of this state, or of any city or town in this state, or in any national bank, or in such other stocks and securities as may be approved by the auditor　*　*　*" (Hurd's Illinois Statutes, 1905, p. 206.)

The Act of 1883 declares that every foreign insurance

company upon coming into the state shall include in its application "the number of shares of stock of every kind owned by it, the par and market value of the same, * * *" (Hurd's Illinois Statutes, 1905, sec. 40, p. 1170).

By the Act of 1877 each Illinois trust company must show in its annual statement "The amount of stocks and bonds of this state, and of the United States, of any incorporated city of this state, and of any other stocks and bonds owned by such company, * * *" (Hurd's Illinois Statutes, 1905, sec. 137, p. 540).

The Act of 1893 (amended 1897) declares that any mining or manufacturing company of this state shall have the power to "own and hold shares of the capital stock, and to own and hold securities of any railroad company, * * *" when such roads connect the different plants with each other or with other railroads. (Hurd's Illinois Statutes, 1905, sec. 148, p. 542.)

The Act of April 17, 1899, provides that surety companies may invest in the same securities as life insurance companies are empowered to buy and hold. (Hurd's Illinois Statutes, 1905, sec. 102, j, p. 532.)

The Act of June 7, 1899, declares that every accident insurance company incorporated in or doing business in this state, shall include in its annual statement the "Number of shares owned in any railroad, * * *" (Hurd's Illinois Statutes, 1905, sec. 218, p. 1212).

It would seem from these statutes that there was no public policy in this state forbidding a corporation either domestic or foreign (foreign railroad companies not now being considered) from investing its surplus funds in the stock of another corporation. On the contrary such power is recognized or expressly granted in the acts cited. It is only when such investment is made for an unlawful purpose, such as to prevent competition, or to create a monopoly that the law forbids the same. Whether the power exists in any corporation to buy and hold the stock of another company depends on the charter of the purchasing company and on the law under

which it is created. Given that power there is no statute in this state which forbids its exercise. It should be noted that in several of these acts shares of stock in railroad corporations are specifically mentioned as proper stocks for investment. All the corporations referred to in the various acts cited were granted or had other powers than that of investment. But that fact is immaterial. If the power to invest be unlawful when it is the only power granted, it is unlawful when added to other powers. Such is the distinct ruling in *Stevens v. Pratt,* 101 Ill. 206, where the only power granted to the United States Mortgage Company, a foreign corporation, was to loan money. This fact was pointed out by counsel with the further fact that the Illinois corporations to whom this power of investment was given had also other powers, such as the power to insure, to act as surety or as trustee, to mine or manufacture and the like. The supreme court sweeps this argument aside, saying among other things: ''Can it possibly make any difference to the sovereign state of Illinois, or to any of its citizens, whether a foreign corporation, which comes here to loan its money, has power by its charter to effect insurance, as well as to loan money, or whether it has power merely to loan money? Is there anything in the exercise of this power by a corporation which is affected by the additional powers possessed by the corporation, or by the fact whether or not it has additional powers? Until it can be demonstrated that the possession of the additional powers can, in some substantial way, affect the loan, we must hold that it can make no difference whether the corporation be authorized to bank, or effect insurance, *or build railroads,* as well as to loan money, or whether it is authorized to effect loans, solely.'' (p. 228.)

What is shown by the statutes of this state concerning foreign railroad companies?

The Act of 1855 authorized all domestic railroad companies to make, with any other domestic railroad, or with ''railroad corporations of other states,'' any arrangement ''for leasing or running their roads, or any part thereof, * * * as shall be necessary and convenient for carrying into effect

the object of this act;'' and it gave them the right to connect with each other ''and with the railroads of other states, on such terms as shall be mutually agreed upon by the companies interested in such connection.'' (Hurd's Illinois Statutes, 1905, p. 1573, pars. 44, 45.)

In *The Illinois Midland Railway Co. v. The People*, 84 Ill. 426, it was held under this act, that a plea to an information in the nature of a *quo warranto*, charging one railroad company with usurping the powers and franchises granted to another, which sets up a contract between it and the other company, authorizing it to operate the road of such other company, and that it is operating the road under such contract, is a good plea. (429.)

The Act of 1875 enlarged the Act of 1855 by authorizing all domestic railroad companies and all railroads of ''any adjoining state,'' when in possession of or operating connecting railroads ''under lease in perpetuity or for a period of not less than twenty years'' to purchase or sell the remaining interests of the leased road. (Hurd's Illinois Statutes, 1905, p. 1573.)

In 1873 an act was passed permitting domestic railroad corporations to consolidate with each other, under certain conditions and restrictions. Under this act any two domestic railroad companies where their lines are connecting and not parallel or competing may consolidate. (Hurd's Illinois Statutes, 1905, p. 509.)

By an act passed in 1883, it is provided that where a railroad situate partly in this and partly in another state and heretofore owned by a corporation formed by consolidation of railroad corporations of this and other states, has been sold under decree of court and has been purchased as an entirety and is now held by two or more corporations of two or more states, it shall be lawful for the domestic corporation to consolidate its property, franchise and capital stock with the property, franchises and capital stock of the foreign corporation upon such terms as may be agreed upon. (Hurd's Illinois Statutes 1905, p. 1572, sec. 39.)

The Act of 1885 provides that all domestic railroad compa-

nies "which now are, or hereafter may be in possession of, and operating in connection with, or extension of their own railway lines, any other railroad or railroads, in the state or in any other state or states, or owning and operating a railroad which connects at the boundary line of this state with a railroad in another state," may purchase such other railroad property with its corporate rights and franchises. (Hurd's Illinois Statutes, 1905, p. 1606.)

In 1893 an act was passed authorizing railroad companies, in consolidating so as to form an interstate line, to fix the terms of such consolidation, which terms may be the payment or retirement of the preferred stock of the companies and the issue of new preferred stock. (Hurd's Illinois Statutes, 1905, sec. 42, p. 1573.)

By the Act of 1897 all agreements, purchases and sales made by and between domestic railroad companies and foreign railroad companies between July 1, 1874 and July 1, 1893, were ratified, approved and confirmed. (Hurd's Illinois Statutes, 1905, sec. 198, p. 1607.)

Section 14 of chapter 114, being the general act relating to the incorporation of domestic railroad companies, provides that "it shall not be lawful for such corporation to use any of the funds thereof in the purchase of its own stock, or that of any other corporation, or to loan any of its funds to any director or other officer thereof, or to permit them or any of them to use the same for other than the legitimate purposes of the corporation;" *Provided,* that any domestic company whose road connects with any railroad of any other state, "shall have power  *  *  *  to own and hold the stock and securities" of such connecting road; "such ownership or holding to comprise at least two-thirds in amount of the stock of such corporation." (Hurd's Illinois Statutes, 1905, p. 1567.)

The Act of 1899 declares that whenever any foreign corporation shall be in possession of any railway situate in Illinois belonging to a domestic company, or shall own or control all the capital stock of such domestic corporation, "then the corporation of this state may sell and convey, and such cor-

poration of another state    *    *    *    may purchase an
*    *    *    of such railroad'' with all its rights, franchises
and privileges and forever use and enjoy the same, under
prescribed terms.    (Hurd's Illinois Statutes, 1905, p. 1611.)

It is shrewdly inferred by counsel for complainants that
some of these acts were passed to fit special cases.    In one
or more instances this inference is verified by the railroad
history of this state.    Though this be true yet these several
acts are public laws of this state, which may be taken ad-
vantage of in similar cases, and which may be examined in
the effort to ascertain what is and has been the public policy
of this state upon the main question here in issue.

A review of these acts show that the uniform public policy
of the state of Illinois has been and still is to encourage the
building and maintenance of railway lines for the transpor-
tation of goods and of passengers.    The power to lease, to
enter into operative contracts, to consolidate connecting lines,
to buy and to sell, has been freely granted; and it also shows
that the public policy of the state is opposed to and forbids
the union or consolidation of parallel or competing lines.

The Act of 1899 assumes and recognizes the right of a for-
eign railroad corporation, having the power by its charter to
purchase the stock of other corporations, to buy and hold
stock in an Illinois railway corporation.    It says that when-
ever any foreign corporation ''shall own or control all the
capital stock of such corporation of this state, then the cor-
poration of this state may sell and convey,'' etc.    These are
not words of grant or of authority, but are words recognizing
the existence of a right of power in the foreign corporation.

Chapter 114 by its terms relates to the domestic railroad
corporations formed under the act.    It does not concern it-
self with foreign railroad corporations.    Section 14 of that
act declares how the funds of the domestic corporation may
not be employed.    It prohibits the use of such funds in the
purchase of the stock ''of any other corporation.''    The ques-
tion of restricting the investment of the funds of a foreign
corporation was not before the legislature, and this section,

even by implication, does not lay down any rule in relation thereto. It was and is a matter of concern to the lawmaking power of this state as to the manner of the investment of the funds of its own corporations; but it has no such concern as to the investments of foreign corporations, whether they build and operate railroads, or sell life or fire insurance, unless such investments are made or are used for an unlawful purpose, such as the preventing of competition, or the creation of a monopoly or a perpetuity. The *proviso* to this section grants to a domestic railroad the power to own "the stock and securities" of any connecting railroad. The fact it also provides that the purchasing company shall acquire at least two-thirds of the stock of the railroad in which it invests, does not take away the power to purchase, but does require the purchase of two-thirds thereof before such owning and holding shall entitle the investor to take over the other road.

The Act of 1905 is entitled "An Act to regulate the admission of foreign corporations for profit, to do business in the State of Illinois."

In this act it is provided that no foreign corporation can be admitted "to transact any business, or exercise any of its corporate powers" in Illinois until it complies with its conditions; that no foreign corporation can be admitted to do business in the state "for the transaction of which a corporation cannot be organized under the laws of this state," and that the act shall be construed not as a grant of power, "but as a limitation upon interstate comity." (Hurd's Illinois Statutes, 1905, p. 512, secs. 67$b$ to 67$j$.)

Concerning this act complainants counsel say: "To hold and vote stock in an Illinois corporation is, we concede, not a doing of business in the state within the meaning of the Act of 1905, so as to require the formalities of that Act to be complied with as a condition precedent to the right to own and vote." (Brief, 108.) It appears in this case that the only act the Securities Company or the Union Pacific ever did, or now desires to do in this state, is to vote the stock they hold in the Illinois Central, at stockholders' meetings.

Section 4 of this Act closes with the words: "Nor shall this act be construed as a grant of power to any corporation admitted hereunder but as a limitation upon interstate comity"— But how can these words which concern no other corporations than those "doing business" in the State, apply to corporations which confessedly are not included in the act?

I do not find in any of these acts, relating to domestic corporations or to foreign corporations, a declaration that foreign corporations, including railroad corporations, may not buy, own and hold the stocks of domestic corporations; or, that having such ownership, they may not exercise all of the rights and privileges inherent in and necessary to full ownership. Nor have I been referred to any Illinois decision, nor has any come to my knowledge, declaring that such investments are against the public policy of the state. The right of the lawful owner of such stock to vote it at meetings of the stockholders should not be denied in the absence of a clear prohibition contained in the statutes of the state or to be found in some decision of our supreme court.

It is a matter of common knowledge that for years foreign corporations, including railway corporations, have been large purchasers and holders of stock of many of our domestic corporations, including domestic railway corporations. The annual statements of such holding corporations, in the many cases in which such statements are required by law, have shown this ownership. The yearly reports of the Railroad and Warehouse Commission set forth the income of all rail-roads from stocks of domestic corporations severally owned and held by them. The governor of this state is *ex officio* a director of the Illinois Central, upon whose books for the last seven years the Securities Company has stood registered as the owner of 80,000 shares of its stock. In these and in so many other ways has such ownership been published to the world that the knowledge of it may be deemed to be almost universal; and yet it does not appear that the executive department of the state by any legal proceeding has ever questioned the right or power of any foreign corporation, having

such express power given it by the state of its creation, to buy, hold and vote the stock of any domestic corporation. The executive department is neither ignorant nor careless. This silence must proceed from the belief that such holdings are *intra vires,* and are not prohibited nor opposed to public policy.

Investment companies are of two classes—the one, while exercising other powers, which form the main reason for its creation, purchases the stock or bonds of other corporations in order that its idle capital necessarily held for the payment of obligations not yet matured or of betterments not yet made, in the waiting interval, may bear interest. Of such a life insurance company is an example. The other with its own stock or money, and as its main business, buys stocks and bonds of other corporations and holds them either in the form received or in some modified form. The interest upon the bonds and the dividends upon the stock thus held constitute its profits. The Securities Company is an example of this latter class. There is nothing illegal nor against public policy in either of these forms. It is only when such a corporation is formed or is used for some unlawful purpose which stifles competition, or creates a monopoly, or establishes a perpetuity, or directly tends to bring about any of these things, and such intention is pleaded and proved, that the courts will suppress or right the wrong and will punish the offender. No corporation, however broad are its granted powers, is authorized to exercise these powers in any mode which the law of the state would not justify in any private person or in any unincorporated body. *Oregon Railway and Navigation Co. v. Oregonian Railway Co.,* 130 U. S. 1, 26.

The Railroad Securities Company is an investment or holding corporation of the state of New Jersey, clothed with power to purchase, receive, hold and own bonds, mortgages, debentures, notes, shares of capital stock, and other securities of any railroad company or other public service corporation, with all the rights, powers and privileges of the individual ownership thereof, including the right to vote thereon.

In 1900 the Securities Company purchased 80,000 shares of the capital stock of the Illinois Central. It still owns this stock. No question is raised in this case but that the several grantors had title to the stock they then sold to the Securities Company, nor is it questioned but that such purchases transferred to the Securities Company all the property rights in said stock theretofore possessed by such vendors. After it became the owner of this stock the Securities Company surrendered the original certificates therefor to the Illinois Central, and new certificates were issued by the latter company to the Securities Company in its name for a like amount; and thereupon the Illinois Central registered upon its books the Securities Company as the owner and holder of said 80,000 shares of stock, and such registration still stands. All these matters were participated in by Mr. Fish. It was not until the sale of his stock in that company in 1906 to the Union Pacific, that he lost his interest in the Securities Company. At each succeeding annual election until 1907, without protest or question by any one, the Securities Company voted this stock, by its proxy Mr. Fish, not only for the election of directors, but also upon all contracts which the shareholders were called upon to confirm or to reject. In 1901 the Securities Company pledged this stock with the U. S. Trust Company to secure its outstanding bonded indebtedness in the sum of $8,000,000, but retained its right to vote said stock. It is and has been the owner and holder of no other railroad stock. About one year ago the Union Pacific, which theretofore was a large holder of the stock of the Securities Company, by additional purchases became the owner and holder of all the stock of that company except 45 shares in the hands of its directors. It is not contended that the Securities Company is about to vote its stock for any unlawful purpose; but it is contended by the complainants that as the Union Pacific now owns and controls all (or practically all) of the stock of the Securities Company, the latter disappears as a factor in this case; and that if the Union Pacific, on grounds of public policy, cannot directly hold or vote stock in the Illi-

nois Central, it cannot do so indirectly through a holding company of which it is the sole stockholder. If the purchasing company has no power to buy, hold and enjoy the stock it purchases, then whether it buy stock in its own name or through the intervention of individuals or trustees the want of power is the same. (*Dunbar v. American Telephone & Telegraph Co.*, 224 Ill. 9, at p. 26.)

To sustain its contention complainants cite the following cases:

In *Stockton v. Central Railroad Co. of New Jersey*, 50 N. J. Eq. 52, 24 Atl. 964, the Philadelphia & Reading Railway Company, a foreign corporation, had no power to lease the Central Railroad. To accomplish its purpose it promoted the creation of a domestic company, having that power, and the lease was thereafter made to such domestic company. The court looked through this device and declared the lease void. (p. 745.)

The *Central Railroad Co. of New Jersey v. Pennsylvania Railroad Co.*, 31 N. J. Eq. 475, is a like case, and a like result was reached.

*State v. Standard Oil Co.*, 49 Ohio St. 137, 30 N. E. 279. The case was a *quo warranto*, and the act done was *ultra vires* the corporation and against public policy, being in restraint of competition. The court held that where all the stockholders joined in the doing of the act and it called for corporate action it should be considered the act of the corporation.

*People v. North River Sugar Refining Co.*, 121 N. Y. 582, is similar to the last case.

In *United States v. Milwaukee Refrigerator Transit Co.*, 142 Fed. 247, the proceeding charged was an attempt to secure rebates in violation of the Inter-State Commerce Act, and the Transit Company was created by the Brewing Company to accomplish this purpose. On demurrer the court held the bill good.

*Southern Electric Securities Co. v. State*, 44 So. 785 (Miss.), is like the last in that the object sought to be obtained was

unlawful and the restrained company had been created to carry out this design.

In *Ford v. Chicago Milk Shippers' Association*, 155 Ill. 166, it appeared that a corporation had been formed to control the sale and price of milk in Chicago. The court says: ''And where, in the organization of the corporate body or the control exercised by the stockholders in determining the agencies selected for managing its business, the business as thus conducted, managed and controlled is against public policy or in contravention of a statute of the state, such acts of the corporate body and of the individual shareholders are the combined acts of all, and courts are not so powerless that they may not prevent the success of ingenious schemes to evade or violate the law.'' (p. 180.) The statutes of Illinois permitted a private person to bring the action.

It will be seen in each of these cases that the action was brought by the state or under a special statute; that the act done or attempted to be done was in itself unlawful; and that the corporation was created for the purpose of doing the illegal act, or had directly participated in the doing of it. When these facts had been alleged and proven the court disregarded the corporate entity in order to get at the substance of the unlawful thing that it might prevent the wrong and punish the wrongdoers. In the case at bar the Securities Company was lawfully organized for a lawful purpose; it owned the stock and had a right to vote it, and it was not a party to the transaction by which it is claimed it lost its right to vote the stock.

By the express terms of its charter the Securities Company has the right to buy, hold, own and vote the stock of other corporations of a public service character, in the state of its creation and elsewhere. In New Jersey its ownership of such stock as it purchased, with all the rights which follow absolute ownership, is not, and cannot be questioned.

Viewed in the abstract, the question as to who owns the stock of a corporation, whether that ownership be individual or corporate, by one or by many, is immaterial. In each and

every case the officers and directors of the corporation control
its policy and its property. The ownership of its property
is as firmly fixed in the corporation when all its stock is
massed in the hands of one stockholder, as it is when such
stock is distributed among a thousand holders. The greater
or lesser number of its stockholders does not impair or take
from it any of its rights or properties. The title of a corpo-
ration to its property and the enjoyment of all the rights
going with and making up that title cannot be taken away
by showing that any or all of its stockholders had no power
to exercise such rights.

In *Hopkins v. Roseclare Lead Co.*, 72 Ill. 373, appellees, a
corporation, claimed to own a 99-year lease of certain min-
eral lands. This lease had been regularly transferred to the
appellee company; afterwards one LaGrave, a large stock-
holder in the company, executed instruments purporting to
convey the said lease and other rights and property to said
Hopkins. The supreme court reversed the cause for want
of proper parties defendant, but in the opinion say:

"It is insisted that LaGrave had no power to make the sale
of the leases, to transfer the control of the suit, or to sell the
20 acres of land, as they were all owned by the company.
He was but a stockholder, and as such had no power to make
the sale. He, although owning the majority of the stock,
could not act for the company, unless specially authorized.
He could no doubt control the action of the company by the
election of its officers, but still the company could only act
through its officers, or by expressly delegating power to oth-
ers, whether a stockholder or other persons." (p. 379.)

In *Sellers v. Greer*, 172 Ill. 549, two stockholders who
owned all the stock of a corporation (except two shares, held
by their sons, for which the sons paid nothing), attempted
to divide and to dispose of the corporate property. It was
held that they had no power to do so. "A corporation is an
artificial being created by law, clothed with certain powers.
It acts through its board of directors and officers. Its prop-
erty is not subject to the control or disposition of its members

or stockholders.'' This holding is sustained by many authorities cited. (pp. 553 *et seq.*)

In *Coal Belt Electric Railway Co. v. Peabody Coal Co.,* 230 Ill. 164, all the stock of the appellant company was purchased by George J. Gould. As to this phase of the case the court say: "By its purchase Mr. Gould did not acquire the ownership of the property of the railway company. The ownership of that property remained in the Coal Belt Electric Railway Company as before, unaffected by the sale. Mr. Gould merely became a stockholder of the railway company but not the owner of its property in a legal sense, though he could control its action by the selection of its officers. (*Humphrey v. McKissock,* 140 U. S. 304; *Sellers v. Greer,* 172 Ill. 549; 2 Cook on Stock and Stockholders, sec. 709.) After the transfer of the stock the Coal Belt Electric Railway Company sustained the same relation to its property as before. It neither acquired nor lost any right, by estoppel or otherwise, for it was no party to the transaction.''

(See also *Ulmer v. Lime Rock Railway Co.,* 98 Me. 579, 594, 57 Atl. 1001; *Oregon Short Line Co. v. Postal Telegraph Cable Co.,* 111 Fed. 842, 844, 845; *Commonwealth v. New York Ry. Co.,* 132 Pa. St. 591, 19 Atl. 291.)

The right of the Securities Company to vote this stock stands uninfluenced and unimpaired by the fact that the Union Pacific owns all or practically all its stock. So long as the voting power of the Securities Company is used by its officers and directors in a lawful manner, and for lawful purposes, it is immaterial who owns its stock. As an independent corporation it holds its stock and other assets not only for the benefit of its stockholders, but also for the benefit of its certificate holders, who are vitally interested in the 80,000 shares of stock held by the Trust Company.

The Act of 1905 has no application to the Securities Company. A careful inspection of the language of the Act will lead to the conclusion that it was intended to take effect upon causes of action and demands arising after its passage, and upon none other. Statutes are prospective, and will not be

31

construed to have a retroactive operation unless the language employed is so clear that it will admit of no other construction. Retrospective laws are not looked on with favor. (*People v. McClellan*, 137 Ill. 352; *Richardson v. United States Mortgage & Trust Co.*, 194 Ill. 259; *People v. Hummel*, 215 Ill. 43, 46.)

Again: The right to vote this stock accrued to the Securities Company when it became the owner of the stock in 1900. To impair this right by force of a subsequent statute is forbidden by section 10 of article 1 of the constitution of the United States, and by section 14 or article 2 of the constitution of the state of Illinois.

I am of opinion that a valid corporation, similar to the Securities Company, can be formed under the Illinois statutes.

Section 1 of the General Incorporation Act declares: "That corporations may be formed in the manner provided by this Act *for any lawful purpose*, except banking, insurance, real estate brokerage, the operation of railroads and the business of loaning money."

Section 5 says that "Corporations formed under this Act * * * may own, possess and enjoy so much real and personal estate as shall be necessary for the transaction of their business, and may sell and dispose of the same when not required for the uses of the corporation * * * and may have and exercise all the powers necessary and requisite to carry into effect the objects for which they may be formed."

Is the purpose for which the Securities Company was formed a "lawful purpose" under this Act?

The buying by one corporation of stock of another corporation is not *malum in se*. It does not come within any of the exceptions named in the Act. The legislature of this state, in a series of acts extending over many years, has granted to fire insurance companies, to life insurance companies, to mining and manufacturing companies, to gas companies, to accident insurance companies, to trust companies, and to railroad companies the power to buy, own, hold and enjoy stock of other corporations. If the granting of this power is

unlawful in this state, these acts would not have been passed, or, if passed, would have been condemned by the courts.

"Where the statutes of a state authorize incorporation for any legal purpose, incorporation can be had for buying and selling shares of stock in other corporations." (1 Cook on Corporations, sec. 316, p. 691.)

In each of the following cases (which I cite without going into details) the local statute was similar to that of this state; and in each it was held that a corporation could be formed for the purpose of buying and selling shares of stock in other corporations. *Market Street Ry. Co. v. Hellman,* 109 Cal. 571, 590, 42 Pac. 225; *Vokes v. Eaton,* 119 Ky. 916, 85 S. W. 174; *York Park Bldg. Assn. v. Barnes,* 39 Neb. 834, 839, 58 N. W. 440; *State v. Minn. Thresher Mfg. Co.,* 40 Minn. 213, 223, 41 N. W. 1020.

If, however, it be admitted that a corporation like the Securities Company, having the express power to buy, hold and vote the stock of other corporations, cannot be formed under the laws of this state, this fact alone does not indicate a public policy against such a foreign corporation exercising that power in the state of Illinois. (*Stevens v. Pratt,* 101 Ill. 206; *People v. Fidelity Ins. Co.,* 153 Ill. 25.)

The Union Pacific and the Illinois Central are not parallel or competing lines, but are connecting lines. The former comes east from Utah to Omaha, and there ends. The latter starts from Omaha and comes east to Chicago, and then runs south to New Orleans, where it connects with the Southern Pacific. Granting the contention of complainants that the Union Pacific virtually controls the Southern Pacific, these roads are still connecting lines, and are not parallel nor competing lines with the Illinois Central. The court, with other facts, will take judicial notice of geographical facts in determining whether two railroads are parallel and competing, either in the geometrical sense or in the larger business and financial sense. (*Illinois State Trust Co. v. St. Louis Iron Mountain & So. Ry. Co.,* 217 Ill. 504.

The Union Pacific, under its charter and the laws of Utah,

has a clear right to own and hold shares of stock of the Illinois Central which it purchased in 1906. By the laws of comity it had the right, which is an essential part of that ownership, to vote that stock at the meetings of the stockholders of the Illinois Central, unless such right is forbidden by the statutes of this state or by the public policy of this state. Such prohibition does not exist unless it affirmatively appears. It is not established by the mere lack of legislation upon that subject.

The stock so held by the Union Pacific was bought and paid for by it in the state of New York, and in that state such stock was registered by the Illinois Central upon its stock books. No act relating to that stock was ever done in this state by the Union Pacific, and it intends to perform no act in Illinois except to vote that stock if it may do so.

Much that has been said concerning corporations, the statutes of this state and the decisions of our supreme court is of equal force when applied to the Union Pacific as it is to the Securities Company, and therefore need not be repeated.

Upon the questions here involved the case of *Stevens v. Pratt*, 101 Ill. 206, has an important bearing, and I therefore quote from it somewhat at large. The action was ejectment. Appleby was the common source of title. In April, 1873, he mortgaged real estate to the United States Mortgage Company to secure the payment of $5,000. In September, 1873, he again mortgaged the same property to secure the payment of $2,000. Appellee claimed under the former mortgage, and appellant under the latter mortgage. Appellant asserted that the note and mortgage given to the Mortgage Company were void. The trial court held otherwise. On appeal the supreme court discuss but one question, namely, whether the acts of the Mortgage Company in loaning its money to Appleby and taking from him his note and mortgage therefor were void. They say: "These acts involve no moral turpitude, and they are, in no sensible degree, detrimental to the public welfare, and the only ground upon which their invalidity is claimed is, that the company, as a foreign

corporation, created solely for the purpose of loaning money, can have no legal existence, and hence can do no act forming the basis of a legal right, in this state.'' (p. 211.) The court then re-examined the grounds upon which it decided the case of the *United States Mortgage Company v. Gross,* 93 Ill. 483, and overruled that case.

The court holds that the first section of the General Corporation Act does not show it is a part of the policy of the state that corporations should not be formed in the state for the business of loaning money. ''It is not said, nor is it the reasonable implication, that the corporations excepted may not be formed *under other acts.* Indeed, the implication is directly the reverse, for the business of the excepted corporations, by the proper construction of the language employed, is called 'lawful,' and there can, in the absence of unmistakable language, be no presumption of exclusion of that which is 'lawful,'—that is to say, which has the sanction or permission, and is consequently entitled to the protection of the law.'' (p. 215.)

''It is true *that act* provides for only certain corporations, and gives no right to incorporate for other purposes, and from this there may be an implication that the legislature would not grant the right to be incorporated for the excepted purposes, *in the same manner,* and subject to the *same regulations and restrictions,* but it is not, therefore, to be assumed that the legislature was unwilling to grant the right to be incorporated for the excepted purposes, *in another manner, and subject to other regulations and restrictions.* From the different natures and purposes of the excepted corporations reason exists why different and more stringent restrictions should be thrown around them; but in such a country as ours, the public welfare demands that they be allowed to be created, under proper and wise safeguards for the protection of the public, and not that they be absolutely prohibited.'' (pp. 215, 216.)

''On further consideration and reflection, we are convinced we also erred in holding that the first sentence of section 26

of that law manifests a policy that foreign corporations were to have no right to loan money in this state? That sentence does not say that no foreign corporation except those of like character as are provided to be formed under that act, shall be allowed to do business in this state. It does not assume to define what foreign corporations shall be allowed to do business in this state, but simply to impose regulations and restrictions upon certain named classes or kinds of foreign corporations doing business in this state,—that is, those of like character as it is provided may be formed under that general law. Its exact words are, 'foreign corporations and the officers and agents thereof, doing business in this state,' —(that is, that *are doing* business, not that shall hereafter *be allowed* to do business in this state) 'shall be subjejct to all the liabilities, restricions and duties that are or may be imposed upon corporations of like character organized under the general laws of this state, and have no other or greater powers.' The language is entirely that of regulation and restriction, and not that of grant or prohibition. No corporation is granted the right to do business in the state. No corporation is excluded from doing business in this state." (p. 216.)

"The manifest and only purpose was to produce uniformity in the powers, liabilites, duties and restrictions of foreign and domestic corporations of like character, and bring them all under the influence of the same law." (p. 217.)

"No unfavorable inference can be drawn from the failure of the legislature to enact laws upon the subject." (p. 218.)

"What was in the legislative mind when this general law was enacted? Manifestly only the classes of corporations anticipated to be created under its provisions, as defined in section 1. * * * They were providing for certain corporations, leaving others unprovided for, and so what they did not provide for is not affected by the legislation they enacted, whether we regard domestic or foreign corporations. The excepted corporations and foreign corporations of like character, are simply unaffected by this law." (p. 219.)

"We concede that all foreign corporations might have

been prohibited from doing business in this state except those of like character as contemplated to be organized under the provisions of this act, but then it would have been very easy to have said so in unmistakable terms, and we do not feel warranted in assuming, from the absence of language, or from even (if it were to be found) ambiguous language, that a policy has been adopted so repugnant to the business welfare of our citizens, and so wanting in that spirit of comity which should characterize the conduct of the sister states towards each other.'' (p. 219.)

The court reviews the Illinois cases cited by appellant, and then cites decisions from the United States courts sustaining its position; and refers to many private acts of this state granting to domestic corporations the power to loan money and to take real estate security therefor as indicating the policy of the state in this regard; and holds that if the policy of the states does not permit the business of the foreign corporation in its limits, that policy must be expressed in some affirmative way,—it cannot be affirmed from the fact that the legislature has made no provision for the formation of similar corporations, or allowed corporations to be formed only by general laws. Accordingly the court sustains the validity of the first mortgage.

This case clearly shows that section 26 does not apply to foreign corporations engaged in the ''business of loaning money.'' It follows logically and is beyond question that the same rule applies to foreign railroad corporations, and that they are not bound by the restrictions placed upon domestic railroad corporations. This case has never been departed from by our supreme court.

Complainants assert from the fact the Union Pacific owns twenty-five per cent. of the capital stock of the Chicago & Alton Company, a road which is a parallel and competing line with the Illinois Central, both being corporations of Illinois, that the attempt of the Union Pacific to acquire stock in the Ilinois Central is *ultra vires* and void under the laws of this state.

It is not claimed that there has been any limitation of com-

petition between the Alton and the Illinois Central by reason of such ownership, but it is said that such holding may tend to that result.

It appears in this case that more than fifty per cent. of the stock of the Alton is owned by the Toledo, St. Louis & Western Railroad Company, called the Clover Leaf, a corporation wholly independent of the Union Pacific, thus giving the Clover Leaf absolute and permanent control of the Alton; and that whatever control of the Alton was once had by the Union Pacific has passed from it.

In *Northern Securities Company v. United States*, 193 U. S. 197, that company was in control and management of the

NOTE.—In the case of *Chicago Real Estate Loan & Trust Co. v. Corn Products Co.*, et al., in the United States Circuit Court for the Northern District of Illinois, Eastern Division, Gen. No. 28,695, a cross-bill was filed by one of the defendants to cancel complainant's stock in the Corn Products Company on the ground that the complainant was an Illinois corporation and could not, therefore, own stock in another corporation. A demurrer was filed to this cross-bill. On March 5, 1908, Judge Landis in an oral opinion referred to the above opinion of Judge Ball, and said:—

"In the case of the Corn Products Company, as I have already intimated, I have no doubt whatever that as a legal proposition the complainant cannot hold the stock under the laws of Illinois. The situation would be different in case of a railway corporation—the statute which I have in mind mentions railway corporations. I suppose you gentlemen are both familiar with that statute which was passed a number of years ago. It is general in its terms and provides that if a foreign railway company shall become the owner of a certain amount of stock in an Illinois railway company, the foreign railway company by doing certain things may become the owner of the property of the Illinois railway company through the portion of the stock of which the foreign corporation has already possessed itself. I take that statute to be declaratory. I have read Judge Ball's opinion with respect to railway corporations.

"Railway corporations, however, have always been regarded by the law as being in a different class from general commercial corporations. The state of Illinois has one policy in respect to railway corporations and another policy in respect to commercial corporations. I believe nearly every state does have a different policy. In this case, the state has in my view a policy against investments by these corporations of the funds of that corporation in the stock of other corporations. The demurrer will be overruled."—Ed.

Northern Pacific and of the Great Northern, which were competing roads from the Lakes to the Pacific Ocean.    It owned more than nine-tenths of the stock of the Northern Pacific, and more than three-fourths of the stock of the Great Northern.    It was formed by the stockholders of both roads for the purpose of running these competing and parallel roads under one management, "as held in one ownership."    The Attorney General of the United States brought a suit in equity to enjoin the holding company from voting such stock, and from exercising any control whatever over the acts and doings of the railroad companies, and also to enjoin the railroad companies from paying any dividends to the holding company on any of the stock held by it.

Upon appeal, counsel for the Northern Securities Company argues that there were other carriers within that territory, and therefore the monopoly could not be complete; and that competition in fact had not been lessened.    In answer to this argument the court said: "To vitiate a combination, such as the act of congress condemns, it need not be shown that the combination in fact results or will result in a total suppression of trade, or in a complete monopoly, but it is only essential to show that by its *necessary* operation it *tends* to restrain interstate or international trade or commerce, or tends to create a monopoly in such trade or commerce and to deprive the public of the advantages that flow from free competition."    (p. 332.)

Such is not the case here,—there has been no suppression of trade.    There has been no monopoly.    So far as the Union Pacific has gone it has not control of either road.    The effect of the argument is that if a corporation cannot lawfully acquire a majority of the stock of each of two competing roads, the direct result of which is to create a monopoly or to stifle competition, it cannot acquire any stock, say ten shares, in each of these roads.    I do not think this is the law.    In the subsequent case of *Harriman v. Northern Securities Company*, 197 U. S. 244, the court passed upon the disposition of the stock held by the Northern Securities Company.    It

refused to order the sale of the stock, which was the only logical thing to do if such holdings were absolutely void, because of the financial distress arising from suddenly putting such great blocks of stocks upon the public market. It refused to give the complainants the stock they had put into the combination, since that would give the Union Pacific a majority of the stock of the Northern Pacific, which would be contrary to public policy. It did give, however, to the Union Pacific twenty-one per cent. of the stock of the Northern Pacific, and nineteen per cent. of the stock of the Great Northern. It would not have made this distribution had it been contrary to the statutes of the United States or of public policy for one railroad to hold a minority of the stock of two competing railroads at one and the same time.

. The illegality of such purchases does not begin until the holding is great enough "that by its necessary operation it tends to restrain" trade or to create a monopoly "and to deprive the public of the advantages that flow from free competition."

The usual office of a preliminary injunction is to continue the *statu quo* until the final hearing. Upon the determination of this question, unless the right of the complainants to have the injunction retained is clear, the balance of convenience and inconvenience to the parties litigant has a potent influence. To sustain this preliminary injunction, and thus to prevent the Union Pacific and the Securities Company from voting the stock they severally hold out at the coming election would be to change the *status quo* before the right of these corporations to own and to vote such stock has been fully and finally determined by the court. . With these corporations barred out, the result of the meeting, by the vote of a minority of the stockholders, might be an entire change in the management and in the control and operation of the Illinois Central. To dissolve this injunction and to let the action of the court in regard to the ownership and voting power of this stock await the final hearing, means no more than the continuance of the present management, with the

change of one director only, and he, eight of the director defendants swear, and the answer of the Union Pacific asserts, will be an able, competent man, not under the control of or connected in any way with the latter corporation. The balance of convenience and inconvenience is clearly with the defendants.

I am of the opinion that the Securities Company and the Union Pacific have full ownership of the shares of stock they severally claim to own and hold in the Illinois Central, including the right to vote that stock at the coming stockholders' meeting of the latter corporation; and that such right to vote is not forbidden by the statutes of this state, nor by the decisions of our supreme court, nor by the public policy of Illinois.

Therefore, the motion to dissolve the injunction is allowed.